**UNITED STATES of America, Plaintiff-Appellee,**

v.

**John A. BELZER, Jr., John M. Evans and Richard Clements, Defendants-Appellants.**

**Nos. 83–2130, 83–2146 and 83–2175.**

United States Court of Appeals, Seventh Circuit.

Argued May 31, 1984.

Decided Sept. 18, 1984.

Rehearing and Rehearing En Banc Denied Oct. 18, 1984.

Certiorari Denied Jan. 7, 1985.
See 105 S.Ct. 788.

John C. Hamilton, Parker, Brunner & Hamilton, Charles W. Lahey, South Bend, Ind., Kelly Leeman, Kelly Leeman & Assoc., Logansport, Ind., for defendants-appellants.

Evan M. Spangler, Asst. U.S. Atty., R. Lawrence Steele, Jr., U.S. Atty., Hammond, Ind., for plaintiff-appellee.

Before POSNER and FLAUM, Circuit Judges, and GORDON, Senior District Judge.*

FLAUM, Circuit Judge.

This is an appeal following a jury trial in which the defendants were convicted of violating federal counterfeiting laws. The defendants' main argument on this appeal is that the government's undercover operation leading to their arrests was so outrageous as to violate fundamental principles of due process. We disagree, and we affirm the convictions.

I.

During the summer of 1982, James Farthing traveled from Indiana to Florida to purchase counterfeit currency from the defendants John Evans and John Belzer. He did not make the purchase, however, because the quality of the bills was poor. Later that summer, Farthing, Evans, and Belzer decided to make counterfeit currency together. They bought a printing press from an Indiana company, as well as an arc light plate burner, a vacuum table, a platemaker, paper, and various printing supplies. Shortly thereafter, they determined that they needed $5,000 more to finance

* The Honorable Myron L. Gordon, Senior District Judge for the Eastern District of Wisconsin, is sitting by designation.

their counterfeiting operation, and began to search for someone to provide them with this amount.

At the same time, the defendant Richard "Pete" Clements was looking for a source of counterfeit currency. Through mutual acquaintances, it was arranged for Clements to provide Farthing, Evans, and Belzer with $5,000. Clements supplied the money, requesting that in return he get as much counterfeit currency as he could.[1]

Evans, Belzer and Farthing then began to attempt to produce counterfeit currency in a garage in Indiana. However, they had difficulty operating the printing press and were unable to produce bills of high quality. After several weeks they abandoned the project. At this point, sometime in November 1982, Evans and Belzer returned to Florida, and Clements had the equipment hauled away and stored in a trailer.

In early December 1982, Clements contacted Farthing about the possibility of renewing the counterfeiting effort. During December and January, the two had several more discussions about this subject. During these discussions, Clements expressed an interest in having Belzer and Evans return to Indiana to resume the counterfeiting.

In late January 1983, Farthing was contacted by United States Secret Service Special Agent Lawrence D. Haas Jr. The Secret Service had received a tip from a confidential informant several months earlier, informing it that Farthing was involved in a counterfeiting operation. In December 1982, the Secret Service had learned that Farthing had been arrested on drug charges in Indiana. Thus, in late January 1983, Haas and Farthing discussed the possibility of Farthing assisting the Secret Service in an undercover investigation of Belzer, Evans, and Clements. Farthing agreed to assist the Secret Service, and in return Haas promised to make Farthing's cooperation known to the Indiana authorities involved in Farthing's drug prosecution. Haas supplied Farthing with equipment for tape recording phone conversa-

tions, and requested that he contact Clements, Belzer, and Evans about resuming their counterfeiting operation.

On February 1, 1983, Farthing made the first of many tape recorded phone calls to the defendants. In a conversation with Clements, he suggested that they plan another attempt at counterfeiting, and Clements agreed. The two men then began to discuss the details of the operation. At this time, Clements indicated that he would be willing to travel to Florida to pick up Belzer and Evans and bring them back to Indiana.

On February 2, Evans phoned Farthing, returning a call Farthing had made to him earlier. They discussed the counterfeiting operation. Farthing told Evans that they would be purchasing additional equipment and thus would be able to make counterfeit bills of better quality than those they had made previously. Evans then indicated that he could make counterfeit money, and that he would be willing to try again. During the next few days, Evans and Farthing had several more phone conversations in which they discussed counterfeiting. During one of these discussions, Evans stated that he and Belzer in the past had made counterfeit currency that was not high quality, but that had "passed." Tr. at 571.

During several other phone conversations with Farthing, Evans showed some resistance to traveling to Indiana. He stated that he and Belzer would prefer to run the counterfeiting operation in Florida. At several points, Evans indicated that they might withdraw from the scheme altogether. Farthing also spoke with Belzer, who also stated that he did not want to leave Florida. Ultimately, however, Farthing was able to persuade Evans and Belzer to travel to Indiana. In so doing, he promised them that they would receive $500 each up front, that all the money to finance the operation would be supplied by Clements, and that Clements would travel to Florida and drive them back to Indiana.

1. Clements, the only defendant who testified at trial, disputed this version of the facts. He stated that he gave the $5,000 to an acquaintance as a loan to help finance a vending machine business.

On February 10, Clements met Belzer and Evans in Florida and the three men set out for Indiana. While they were traveling, the Secret Service rented a graphic arts camera and brought it to a slaughterhouse located on a farm that was owned by Clements's brother, which is where the counterfeiting operation was to take place. This camera is used to make photographic negatives which are then used to make offset printing plates, and it is available commercially. The other counterfeiting equipment had already been set up in the slaughterhouse.

Clements, Evans, and Belzer arrived at the farm on February 11, and the counterfeiting operation began the following day. Throughout the next week, Belzer and Evans worked on producing the counterfeit currency, with Belzer primarily responsible for making the printing plates and Evans primarily responsible for operating the printing press. Farthing was not actively involved in the day-to-day operation, though he did visit the slaughterhouse nearly every day. In addition, Farthing instructed Evans and Belzer on operating the graphic arts camera, and he supplied them with some light sensitive tape used in platemaking.

During this time, Farthing was supplying the Secret Service with daily status reports on the counterfeiting operation. On February 14, the Secret Service sought and received a search warrant for the slaughterhouse. On February 16, before the warrant was executed, Farthing purchased additional printing supplies that had been requested by Evans and Belzer, and delivered them to the defendants. On February 18, pursuant to the warrant issued several days earlier, the Secret Service entered the slaughterhouse and arrested the defendants.

The defendants were charged with five counts of violating federal counterfeiting

laws, 18 U.S.C. §§ 471, 474 (1982), and with conspiracy to violate federal law, 18 U.S.C. § 371 (1982). The case proceeded to a trial before a jury on April 18, 1983. The defendants' primary defense was that they had been entrapped or that they had been denied due process of law because of governmental misconduct. The jury returned guilty verdicts against Belzer and Evans on all five counts, and against Clements on three of the counts, acquitting him on the other two. The defendants' post-trial motions were denied, and each was sentenced to prison, Evans for five years and Belzer and Clements for three. This appeal followed.

## II.

■ The defendants have not argued entrapment on this appeal, conceding that there was sufficient evidence of their predisposition to counterfeit to support the jury's verdict. Thus, their primary argument is that the government undercover operation leading to their arrests violated their rights to due process of law and that therefore their convictions should be vacated. In addition, they contend that the government's four-day delay in executing its search warrant violated their constitutional rights, and that this is another reason that their convictions should be vacated.[2] As an alternative to their contention that their rights were violated, the defendants argue that the government's conduct in this case compels us to vacate the defendants' convictions in the exercise of our supervisory powers over the administration of criminal justice.

### A. The Undercover Operation

In *United States v. Russell*, 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1642–43, 36 L.Ed.2d 366 (1973), the Supreme Court stated that "we may some day be presented

---

**2.** Clements has also argued that the district court denied him a jury drawn from a fair cross-section of the community, because it excused the only member of the jury panel who resided in his county. Clements has not claimed, however, that the process used to de-

rive the panel was in any way unfair. In view of this, and because the district court had a proper reason for excusing the prospective juror—his exposure to pre-trial publicity—we reject Clements's argument.

with a situation in which the conduct of the law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." Several years later, in *Hampton v. United States*, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976), five justices of the Supreme Court reaffirmed the principle that criminal defendants may present a defense based on outrageous governmental misconduct, regardless of the defendant's predisposition to commit the crime charged. This circuit also has recognized the existence of such a defense. *See, e.g., United States v. Kaminski*, 703 F.2d 1004, 1009 (7th Cir. 1983).

The due process defense, however, has been invoked successfully only on a few occasions. As this court has noted:

[A]n examination of the post-*Hampton* cases decided by the courts of appeals indicates that due process grants wide leeway to law enforcement agencies in their investigation of crime. Assuming that no independent constitutional right has been violated, governmental misconduct must be truly outrageous before due process will prevent conviction of the defendant.

*Id.* at 1009. The defendants argue that the Secret Service's conduct in investigating their counterfeiting activity was "truly outrageous." We disagree.

The defendants' main argument is that the government "manufactured" the counterfeiting crime of which they were convicted. According to the defendants, the crime would not have occurred but for the government's participation, through its informant, Farthing. Specifically, the defendants complain that Farthing induced them to resume the counterfeiting efforts that they already had abandoned, and furthermore that without the supplies and expertise that he provided, they would not have been able to produce counterfeit bills of sufficient similitude to real currency to constitute a violation of federal counterfeiting laws. *See United States v. Turner*, 586 F.2d 395, 397–98 (5th Cir.1978) (discussing the requirement under 18 U.S.C. § 474 that counterfeit currency resemble genuine currency), *cert. denied*, 440 U.S. 926, 99 S.Ct. 1258, 59 L.Ed.2d 480 (1979).

■ Turning first to the defendants' claim of inducement, this court recently stated that "[w]hen a defendant is pre-disposed to commit the offense due process cannot be violated by Government inducement ...." *United States v. Thoma*, 726 F.2d 1191, 1199 (7th Cir.), *cert. denied*, —— U.S. ——, 104 S.Ct. 2683, 81 L.Ed.2d 878 (1984). We have not stated, however, that the inducement offered by the government cannot be considered in determining whether the government's conduct is so outrageous as to warrant the invocation of our supervisory powers. Assuming that it can be,[3] it is nevertheless clear that the government's inducement in this case was proper. This is not a case in which the government's inducement to commit the crime was "exceedingly generous," *see United States v. Jannotti*, 673 F.2d 578, 600 (3d Cir.) (en banc), *cert. denied*, 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982) or in some other way excessively coercive. *See Greene v. United States*, 454 F.2d 783 (9th Cir.1971) (government agent used veiled threats to induce crime). In fact, the government did not even initiate the counterfeiting operation. Not only had there been a prior counterfeiting attempt involving all of the defendants just before the government's intervention, but it was the defendant Clements who first contacted Farthing about resuming the operation.

3. Because in the exercise of our supervisory powers we focus on the actions of the government rather than on the defendant, we can imagine a situation where the nature of the government inducement should be considered in assessing the outrageousness of the government's conduct, even though the defendant is predisposed to commit the crime charged. In this case, for example, if the Secret Service, through Farthing, had made a credible threat of violence toward one of the defendants and/or his family members if he refused to assist in the counterfeiting operation, we would be abdicating our responsibility if we did not consider this fact in assessing the defendants' outrageous conduct claim.

Farthing, working undercover, did induce the already predisposed team of Evans and Belzer to continue their counterfeiting, but the small amount offered to them hardly gives rise to an outrageous government conduct claim. "[T]he offer of a reasonable inducement [is a] proper means of investigating crime." *United States v. Kaminski,* 703 F.2d at 1009.

■ The defendants also complain that the government provided them with supplies and expertise that were indispensable to their counterfeiting operation.[4] It is well established, however, that the government may supply some items of value toward the perpetration of the criminal enterprise. *See, e.g., United States v. Leja,* 563 F.2d 244 (6th Cir.1977) (government supplied legally obtainable chemicals to illegal drug manufacturers), *cert. denied,* 434 U.S. 1074, 98 S.Ct. 1263, 55 L.Ed.2d 780 (1978); *United States v. Gonzales,* 539 F.2d 1238, 1239 (9th Cir.1976) (government agents were "actively involved in purchasing ink and other supplies, as well as a functioning press," in support of counterfeiting operation). *Cf. Hampton v. United States,* 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976) (government supplied actual contraband which defendant was convicted of selling). Here, the supplies and equipment provided by Farthing were all commercially available, and could have been purchased by the defendants themselves. Moreover, Farthing provided only one of several pieces of equipment necessary to the counterfeiting operation, and only a portion of the necessary supplies. Under these circumstances, the govern-

ment's degree of involvement in supplying the means to commit the crime falls short of being considered outrageous.

■ With regard to the expertise provided by Farthing, the defendants point to their earlier bungled counterfeiting attempt as evidence that they could not have produced passable counterfeit bills without his help. However, the record indicates that Farthing had very little to do with the actual production of the counterfeit bills; all he did was instruct the defendants on operating the graphic arts camera. This was not such a complex task that they probably could not have done it without his help. *See United States v. Twigg,* 588 F.2d 373, 381 (3d Cir.1978) (outrageous government conduct found where government agent provided all knowledge of chemistry necessary to manufacture illegal drug; defendants had no knowledge of chemistry).[5] The defendants did have some experience counterfeiting, and, according to Evans's own statement, in the past had produced counterfeit bills that had "passed." Under these circumstances, it was certainly permissible for Farthing to provide the defendants with some technical expertise to facilitate their counterfeiting. *See United States v. Reifsteck,* 535 F.2d 1030, 1035 (8th Cir.1976) (actual printing of counterfeit bills done by government agents); *United States v. McGrath,* 494 F.2d 562 (7th Cir.1974) (government agents supervised actual printing of counterfeit bills).

Even considering all of the government's actions together, rather than separately, we are not persuaded that the government

---

**4.** There is some indication in the record that Farthing may have paid for some of the supplies himself, or that he may have been reimbursed by Clements and not the Secret Service for some of his expenses. Whether this lessens the government's degree of involvement in the counterfeiting operation for purposes of an outrageous government conduct claim is a question we need not address, in view of our holding.

**5.** The defendants rely heavily on *Twigg,* which is the only court of appeals decision since *Hampton* to vacate a conviction on the basis of outrageous government conduct. In *Twigg,* the Third Circuit found that the Drug Enforcement

Agency was excessively and thus impermissibly involved in the illegal manufacture of methamphetamine. *Twigg* is distinguishable from the case before us because in *Twigg* the government agents and their informant originated the idea of establishing an illegal methamphetamine laboratory, and the informant was "completely in charge" of the production process and supplied all the laboratory expertise. *United States v. Twigg,* 588 F.2d at 380–81. In addition, we note that there is a significant question as to whether *Twigg* is still good law in the Third Circuit. *See United States v. Beverly,* 723 F.2d 11, 12 (3d Cir.1983) (per curiam).

can be said to have "manufactured" the defendants' crime. The defendants have conceded that there was sufficient evidence for the jury to find them predisposed to counterfeit. While we recognize that a person who is predisposed to commit a crime might choose not to act on that predisposition, see Note, *Entrapment as a Due Process Defense: Developments After* Hampton v. United States, 57 Ind.L.J. 89, 126–29 (1982), or in unusual circumstances might be unable to commit the crime, courts have never required prosecutors to prove to a high degree of certainty that a predisposed defendant in a particular case actually would have committed the crime even without the government's intervention. *Cf. United States v. Kaminski*, 703 F.2d at 1008 ("there is no infallible means of divining a defendant's predisposition after the fact"). Here, the Secret Service intercepted a counterfeiting operation that at the time was, if not ongoing, at least fairly likely to be revived successfully. On the facts of this case, we reject the defendants' claim that the government "manufactured" the crime of which they were convicted.

In addition to arguing that the Secret Service "manufactured" their crime, the defendants complain of the manner in which the investigation was conducted. Specifically, they claim that the Secret Service agents had "an overriding desire to obtain a conviction as an end in itself and to create a crime rather than pursue legitimate law enforcement goals of preventing further crime." Clements's Br. at 20. In addition to reiterating the claims that we have already rejected, the defendants support this argument by pointing to the government's use of "a known counterfeiter and convicted felon" as an informant, and to "intentionally . . . deceptive and dishonest acts" committed by Farthing in the course of his undercover work. Clement's Br. at 17, 20.

We can reject these claims without extensive discussion. "[A]rtifice and strata-gem, including the use of paid informants whose employment is made necessary by the clandestine nature of the criminal activities under investigation, may be constitutionally resorted to to uncover and identify those engaged in criminal enterprises." *United States v. Cuomo*, 479 F.2d 688, 692 (2d Cir.), *cert. denied*, 414 U.S. 1002, 94 S.Ct. 357, 38 L.Ed.2d 238 (1973). *See also United States v. Russell*, 411 U.S. at 436, 93 S.Ct. at 1645 ("there are circumstances when the use of deceit is the only practicable law enforcement technique available"). As this court has stated, "Undercover police work in general, and the use of men such as [the informant] in specific, is an unattractive business, but that is the nature of the beast . . . ." *United States v. Kaminski*, 703 F.2d at 1010. Here, we find nothing outrageous in the use of Farthing or in the perpetration of a few deceptive acts and statements in the furtherance of the investigation.

■ The defendants also argue that the Secret Service's undercover investigation was particularly outrageous because it was unnecessary. They claim that the government could have prevented them from counterfeiting by simply monitoring any activity around the printing press, a large, rather immobile piece of equipment, or by investigating their previous counterfeiting attempt and prosecuting them for that. However, it is not clear to us that either of these choices would have been effective or even feasible. More important, we are not inclined to second-guess the executive branch concerning its choice of law enforcement techniques. While we hesitate to say that the government's available alternatives can never be relevant to a court's consideration of an outrageous government conduct claim, we are mindful of the Supreme Court's admonition that the federal judiciary should not exercise a " 'chancellor's foot' veto over law enforcement practices of which it [does] not approve." *United States v. Russell*, 411 U.S. at 435, 93 S.Ct. at 1644.[6] Here, we find

6. Many courts explicitly have expressed their disapproval of the undercover law enforcement practices being challenged in cases before them, while at the same time upholding the constitu-

nothing outrageous about the government's choice of law enforcement techniques. Hence, we reject the defendants' claim that the government's undercover investigation constituted outrageous government conduct in violation of the due process clause, or that it provides us with a basis for the exercise our supervisory powers to vacate the defendants' convictions.

### B. The Search Warrant

The defendants have also challenged the government's execution of its search warrant. Specifically, they claim that the government agents sought a warrant and then purposely delayed its execution until they were sure that the defendants had produced counterfeit currency of sufficient similitude to real currency to constitute a violation of federal law. They further object to the fact that during the four-day interval between the procurement of the warrant and its execution, Farthing provided them with more printing supplies. They contend that the government's handling of the search warrant amounted to outrageous government conduct, particularly in combination with the rest of the undercover investigation. Alternatively, they argue that the delayed execution of the search warrant amounted to an independent violation of their fourth amendment rights, because the facts forming the basis on which the warrant was issued were changed before it was executed. They claim not that this violation of their rights required the suppression of evidence at trial—they are foreclosed from arguing this because they did not raise it at trial—but that it "is itself independent and most compelling evidence of the constitutional misconduct that infected all parts of this prosecution." Belzer's Reply Br. at 2.

█ We do not find that the government's delayed execution of the search warrant makes its conduct in this case "outrageous." Although the defendants

have suggested that the Secret Service manipulated the judicial process by obtaining a search warrant and then waiting to execute it until they were sure that the defendants had committed a crime, they failed at trial to elicit any evidence concerning the reasons for the government's conduct. Thus, there is an inadequate record to support their manipulation theory. Moreover, on the facts of this case it appears that there was no reason for the government to have manipulated the judicial process. We do not see what advantage the government would have gained by seeking a search warrant before it was prepared to execute it. While one can imagine a situation where law enforcement officials obtain a warrant as quickly as possible before circumstances giving rise to probable cause have a chance to change, this is not such a case. Probable cause in this case was present as long as the defendants' operation in the slaughterhouse was in existence, a situation that the Secret Service was monitoring closely. Thus, the real question is not why the government delayed execution of the warrant, but why it sought a warrant as early as it did.

The most obvious explanation is that the Secret Service obtained the warrant before realizing that the defendants had not yet produced any counterfeit bills of sufficient quality to pass as genuine bills. Once they had this realization, they decided to postpone execution of the warrant until they would have a proper basis for arresting the counterfeiters. According to this theory, the government was perhaps a bit inept, but not manipulative. Although our theory may be incorrect, the defendants have done nothing to contradict it. In short, the defendants are alleging that the government's handling of the search warrant amounted to outrageous governmental conduct, and yet they have failed to make a factual showing that in securing or execu-

tionality of those practices. *See, e.g., United States v. Beverly,* 723 F.2d 11, 13 (3d Cir.1983); *United States v. Garrett,* 716 F.2d 257, 275 n. 10 (5th Cir.1983); *United States v. Kelly,* 707 F.2d 1460, 1477 (D.C.Cir.), *cert. denied,* — U.S. —, 104 S.Ct. 264, 78 L.Ed.2d 247 (1983); *United States v. Leja,* 563 F.2d 244, 246 (6th Cir.1977), *cert. denied,* 434 U.S. 1074, 98 S.Ct. 1263, 55 L.Ed.2d 780 (1978).

ting the warrant, the government intentionally manipulated or abused the judicial process. In the absence of such a record, we will not find outrageous governmental conduct on the basis of the Secret Service's delay in executing the search warrant.

■ Nor will we find outrageous government conduct on the basis of Farthing's furnishing of supplies to the defendants after the search warrant was issued. Farthing was responding to the defendants' request for him to replenish their depleted stock of supplies. To refuse their request might have seemed unusual, in light of his previous willingness to assist them, and thus might have jeopardized his cover. Allowing the Secret Service in this case to continue to assist the defendants even after obtaining a search warrant for their premises admittedly tends to underscore the somewhat active role that law enforcement officials are permitted to play in criminal enterprises that they are investigating. However, this latitude that we permit law enforcement officials clearly is an accepted feature of our jurisprudence, as we have already discussed. Given that it was permissible for the government to furnish the defendants with materials used in their counterfeiting operation, we find that the fact that some of these materials were furnished after the government obtained its search warrant makes no difference for purposes of this appeal.

Finally, we turn to the defendants' claim that the delay rendered the search warrant defective and that thus their fourth amendment rights were violated. We recognize that there is at least a question as to whether the warrant became defective because of the delay. *Compare United States v. Bedford,* 519 F.2d 650, 655 (3d Cir.1975) (warrant must be executed within "reasonable time" after issuance; reasonableness "functionally measured in terms of whether probable cause still existed at

the time the warrant was executed"), *cert. denied,* 424 U.S. 917, 96 S.Ct. 1120, 47 L.Ed.2d 323 (1976) *with United States ex rel. Beal v. Skaff,* 418 F.2d 430, 433 (7th Cir.1969) ("a 'stale warrant,' the execution of which is unduly delayed by the police in order to assure the seizure of the goods sought, is invalid"). However, we need not decide that question. If the warrant was defective, the proper remedy would have been the suppression of evidence seized pursuant to the warrant, a remedy which the defendants chose not to pursue. Although it is possible that the improper execution of a search warrant might be relevant to a claim of government misconduct, as the defendants contend, we find on the facts of this case that even if the search warrant was defective, in the absence of a showing that the government intentionally manipulated or abused the judicial process, the government's conduct does not provide a sufficient ground for vacating the defendants' convictions.[7]

The defendants' convictions are affirmed.

---

**7.** In *United States v. Kaminski,* 703 F.2d 1004, 1009 (7th Cir.1983) and *United States v. Thoma,* 726 F.2d 1191, 1198 (7th Cir.1984), *cert. denied,* —— U.S. ——, 104 S.Ct. 2683, 81 L.Ed.2d 878 (1984), this court indicated that if in the course of its investigation, the government violates the defendants' constitutional rights, the "truly out-

rageous" standard would not be applicable. We hold today that the government's handling of the search warrant does not invalidate the defendants' convictions, even under a standard less permissive than the "truly outrageous" standard.