**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**James J. VALONA,
Defendant–Appellant.**

No. 86–2817.

United States Court of Appeals,
Seventh Circuit.

Argued May 27, 1987.

Decided Nov. 20, 1987.

Stephen M. Glynn, Shellow, Shellow & Glynn, S.C., Milwaukee, Wis., for defendant-appellant.

Francis D. Schmitz, Asst. U.S. Atty., Milwaukee, Wis., Eric J. Klumb, R. Jeffrey Wagner, Asst. U.S. Attys., Patricia A. Gorence, U.S. Atty., for plaintiff-appellee.

Before WOOD, FLAUM, and EASTERBROOK, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

On May 11, 1983 the defendant, James J. Valona, attempted to purchase ten kilograms of cocaine from an undercover agent. Federal agents arrested and released Valona the same day. A paid government informant, Arthur Rapkin, was instrumental in arranging the attempted buy. On July 2, 1985 the grand jury returned an indictment against Valona, charging that he attempted possession of cocaine with an intent to distribute, criminalized by 21 U.S.C. §§ 841, 846. The jury returned a guilty verdict on the charge.

Valona raises three issues on appeal: 1) whether or not a twenty-eight month delay between the arrest and unsealing of the indictment, during which time a potential defense witness died, violates due process under the fifth amendment; 2) whether or not it was error for the trial court to deny Valona's request for the informant Rapkin's prior criminal record, record of performance as an informant, and details of the consideration he received; and, 3) whether or not the government's "pre-targeting" of Valona, providing Valona with cocaine, and entering into a contingent fee

arrangement with Rapkin constitutes outrageous conduct. We find no error, and for the reasons discussed below, we affirm defendant Valona's conviction.

## I. BACKGROUND

William Hehr, a Special Agent with the Drug Enforcement Agency (DEA), approached Arthur Rapkin about assisting in drug investigations. At that time Rapkin lived outside of Wisconsin. He agreed to assist in such activities if he received approximately ten percent of the value of any contraband, fruits, or instrumentalities of criminal activity recovered with his assistance. The reduction or elimination of any pending or contemplated charges against Rapkin did not figure into the deal. Rapkin also requested that the government keep his identity confidential for an indefinite period. The DEA–Rapkin agreement, including the ten percent and confidentiality provisions, was consummated. The government supplied Rapkin with sufficient funds to pay his travel expenses to Milwaukee, where one of his assignments included involvement in an operation in which undercover government agents attempted to sell cocaine to a suspected drug trafficker. This suspected trafficker was the defendant James J. Valona.

Rapkin and Valona had a previous social and/or business relationship. It is not clear how Rapkin reestablished contact for this undercover operation, nevertheless, he met with Valona and gained his confidence. On April 22, 1983 Rapkin introduced Valona to "Joe Berghart", claiming Berghart was a chemist capable of manufacturing cocaine hydrochloride of high purity. Actually Berghart was an undercover DEA Agent, Melvin Schabilion. This April 22 meeting took place at a Brookfield, Wisconsin restaurant.

During this meeting Valona learned that Schabilion had a sample of the cocaine he was capable of manufacturing. Valona indicated he had access to a mass spectrometer, a testing instrument that could be used to test the purity of cocaine. Apparently Valona said that if testing showed that the cocaine was as pure as Schabilion claimed, he and his associates might want to purchase up to twenty kilograms of the drug.

From the restaurant the three, Valona, Schabilion, and Rapkin, proceeded to Rapkin's car. There Schabilion handed Valona a package containing three and one-half grams of cocaine, cocaine that Rapkin apparently told Valona was available for testing. This ended the April 22 meeting.

Rapkin spoke with Valona several times between April 22, 1983 and May 11, 1983. Valona agreed to purchase ten kilograms of cocaine for $450,000, and Rapkin communicated this to Schabilion. It was agreed that on May 11 Valona would bring the money to the Marriott Hotel in Brookfield to effectuate the money for cocaine exchange.

As planned, Rapkin and Schabilion positioned themselves in a room in the Marriott on the 11th of May. Valona called several times to let them know he was on his way but running a bit late. He arrived between 5:30 and 6:00 p.m. Schabilion and Rapkin asked that Valona show his cash before they displayed the cocaine. This was agreeable as was the request that Schabilion accompany Valona to a Waukesha apartment, where the purity of the cocaine could be tested. Valona let it be known that if the ten kilograms tested as positively as the three and one-half gram sample, he and his associates would be interested in purchasing up to twenty-five kilograms of the drug the following week.

Valona left and then returned to the Marriott room carrying a suitcase containing two brown paper bags. The bags contained currency totalling $285,000. Falling short of the agreed upon $450,000 purchase price, Valona asked that Schabilion accept collateral to secure the remaining balance for a period of one week. Once again Valona left the room, and when he next returned he carried the same suitcase, this time filled with jewels, coins, and appraisal sheets, as well as the $285,000 in currency. He told Schabilion he had additional silver coins in the hotel, which were too heavy to carry to Schabilion's room. Valona called someone whom he identified as "JB" and

asked that he bring the additional coins to Schabilion's room.

Schabilion and Valona agreed that they would leave the hotel and place the currency and collateral in Schabilion's car, transfer the cocaine from Schabilion's car to Valona's car, obtain the additional coins from JB, and finally drive to the Waukesha apartment to test the cocaine.

They got as far as opening their respective trunks. The trunk opening was a prearranged signal that triggered the action of federal agents who arrested Valona and Schabilion. Valona was held at the DEA office for approximately one and one-half hours and released.

Although Valona had been arrested May 11, 1983, the grand jury did not return an indictment against him until July 2, 1985. The indictment remained sealed until September 13, 1985, at which time Valona was arraigned.

During the period of time between Valona's 1983 arrest and his 1985 indictment it appears that the government sought his assistance in criminal investigations. Also, during the greater part of this period the government continued to keep Rapkin's identity confidential. This changed sometime around March 22, 1985, when the government-informant agreement was modified, and Rapkin's name was divulged, although under the modified agreement he was still excused from any role as a witness in the Valona case. This modification apparently resulted from the government's determination that Rapkin had somehow breached the agreement; therefore, he could not expect the government to honor the agreement, including that portion requiring Rapkin's identity to remain confidential. With the confidentiality barrier removed, the government moved ahead in its prosecution of Valona.

## II. DISCUSSION

### A. Twenty–Eight Month Delay

Valona was arrested on May 11, 1983 and indicted July 2, 1985. He claims that the government's delay in bringing the indictment led to the unavailability of an important defense witness, Thomas Daniels. Daniels died in a plane wreck in the spring of 1985. On November 26, 1985 the magistrate denied Valona's request for an evidentiary hearing on his claim of pre-indictment delay and recommended that Valona's motion to dismiss based on that same claim likewise be denied. The magistrate reasoned that it was unlikely that Daniels would testify, and if he did, his testimony was not clearly exculpatory. Even assuming that substantial prejudice occurred the magistrate went on to find that the government's reason for the delay, to protect the identity of an informant, was a proper motive. In the pretrial order the trial court adopted the magistrate's recommendation and at the end of trial denied Valona's motion for judgment notwithstanding the verdict, in part finding the pre-indictment delay issue had been previously considered and denied.

■ The statute of limitations is the primary source of repose and protection from prosecutions based on stale evidence. *United States v. Marion*, 404 U.S. 307, 322, 92 S.Ct. 455, 464, 30 L.Ed.2d 468 (1971). "The Supreme Court, however, has held that the due process clause of the fifth amendment provides some protection against pre-indictment delay that has caused such substantial prejudice to the defendant as to outweigh the government's reasons for delay." *United States v. Williams*, 738 F.2d 172, 175 (7th Cir.1984) (citing *inter alia United States v. Lovasco*, 431 U.S. 783, 789, 97 S.Ct. 2044, 2048, 52 L.Ed.2d 752 (1977)).

■ The trial court undertook the proper two-step analysis for determining the merits of a claim of prejudice based on pre-indictment delay. First, the defendant must establish that he has suffered actual and substantial prejudice. *Lovasco*, 431 U.S. at 789–90, 97 S.Ct. at 2048; *Marion*, 404 U.S. at 324–26, 92 S.Ct. at 465–66. *See, e.g., United States v. Wellman*, 830 F.2d 1453 (7th Cir.1987); *United States v. Antonino*, 830 F.2d 798 (7th Cir.1987). "Proof of actual prejudice makes a due process claim concrete and ripe for adjudication, [and] it [does not] make[ ] the claim

automatically valid." *Lovasco,* 431 U.S. at 789, 97 S.Ct. at 2048. Second, if the defendant satisfies step one, the court then will balance the prejudice to the defendant against the government's reasons for the delay. *Id.* at 790, 97 S.Ct. at 2048. If the delay has caused such substantial prejudice to the defendant so as to outweigh the government's reason for the delay, the indictment may be dismissed. *Williams,* 738 F.2d at 175. Two lines of cases guide the step-two balancing analysis. *Id.* at 175 n. 1. Under one line, this court has held that the government bears the burden of demonstrating that the delay was necessary. *See, e.g., United States v. Solomon,* 688 F.2d 1171, 1179 (7th Cir.1982). Under the other line of cases this court has held that the defendant bears the burden of demonstrating that some impermissible purpose or ulterior motive motivated the delay. *See, e.g., United States v. Watkins,* 709 F.2d 475, 479 (7th Cir.1983). Of course a resolution of the conflicting authority under step two need not be undertaken if the defendant has not satisfied the prerequisites of step one. *Williams,* 738 F.2d at 175. That is the case here. The defendant has failed to establish actual and substantial prejudice.[1]

■ It is clear that the death of a witness alone is insufficient to establish actual prejudice. *See Williams,* 738 F.2d at 176 (death of witness insufficient where defendant failed to provide evidence linking witness to defendant's version of the facts and court only had peripheral facts it gleaned); *Solomon,* 688 F.2d at 1179–80 (deaths of witnesses during defendant's voluntary flight fail to demonstrate substantial prejudice). *See also Lovasco,* 431 U.S. at 796, 97 S.Ct. at 2051 (appears Court implicitly determined that deaths of witnesses, combined with fact that one witness supplied several of the guns and the other was defendant's brother who witnessed gun transactions, were prejudicial since it undertook a review of the government's reasons for the pre-indictment delay). Valona must show something more than the simple fact of Daniels' death and concomitant unavailability for trial.

■ According to Valona he has shown that something more. In his brief Valona claims that Daniels was at the Marriott on May 11, 1983, where he was seen by federal agents; Daniels knew Valona was at the Marriott for a purpose unrelated to drug trafficking; Daniels participated in several conversations with Valona regarding the purpose of the business between Valona and Schabilion conducted on May 11; and it was Daniels' car that Valona was seen driving on April 22, 1983. Valona claims this would have allowed Valona to controvert Schabilion's version of events and to demonstrate Valona's intention not to act as a principal, aider and abettor, or conspirator in the drug sale.

Earlier, from the record, Valona had stated that "Daniels would testify ... that the defendant advised him he was selling the gems which were going to be used in a cocaine transaction, but that the defendant's only interest was in selling the gems." Valona argues that the government could have verified this information by reviewing telephone and automobile records and speaking with the woman Valona allegedly was meeting at the hotel. The government contends that it is clear that Daniels' testimony, even if believed, would nevertheless establish aider and abettor liability and still result in Valona's conviction as a principal. Valona argues that presence at the scene of a crime, even coupled with the knowledge that another is to commit a crime, is not sufficient to establish aiding and abetting. Valona cites several cases for this proposition, none of which

---

1. Even if we reached step two, and we do not, the government has not delayed for an improper purpose. Agent Hehr's affidavit demonstrates that Rapkin was promised that his identity would not be disclosed and that no prosecutions would be brought if this would result in such a disclosure. Also, Hehr states that on or about March 22, 1985 the agreement was modified to allow disclosure of Rapkin's identity, as long as he would not be called as a witness. It was after this modification that the government commenced its prosecution. Valona has presented no authority demonstrating that such a promise of confidentiality, without more, is an improper reason for pre-indictment delay.

are Seventh Circuit opinions. In one of those cases, *United States v. Campa*, the court stated the following: "The vital element to be proven is that the aider and abettor shared in the principal's essential criminal intent. This may be inferred from the attendant facts and circumstances." 679 F.2d 1006, 1010 (1st Cir.1982) (citing *United States v. Beck*, 615 F.2d 441, 449 (7th Cir.1980)). It was not error for the trial court to infer that the evidence overwhelmingly suggested that at a minimum Valona shared in the principal's essential criminal intent and would be liable as an aider and abettor.

It is not only that the hypothetical testimony may give rise to guilt on an aider and abettor theory that weakens Valona's argument. In the *Williams* case this court stated that the "[witness'] death and consequent inability to testify on [defendant's] behalf would have prejudiced [defendant's] case only if we are convinced that [the witness] would have testified, that his testimony would have withstood cross-examination, and that the jury would have found [him] a credible witness...." 738 F.2d at 176. Of course it is implicit in this analysis that even if we are convinced testimony as outlined would occur, we must still evaluate this testimony against the other trial evidence to determine if indeed its introduction would affect the trial outcome.

Daniels' role is too peripheral to view his absence as substantially prejudicial to Valona. In addition we are not convinced that "his testimony would have withstood cross-examination, and that the jury would have found [him] a credible witness." *Id.* Indeed, agent Hehr's affidavit indicated that the government believed that any truthful testimony by Daniels would inculpate Valona since Daniels was believed to have been involved with Valona in drug trafficking. It must be remembered that the facts critical to Valona's conviction are that Valona attempted to purchase ten kilograms of cocaine by exchanging $285,000 in currency plus collateral consisting of jewelry and silver coins for what he thought was ten kilograms of cocaine.

Daniels did not directly participate. Only Rapkin, Schabilion, and Valona were in the Marriott room when the final consummation of the planned exchange occurred. Schabilion and Valona, and not Daniels, were in the parking lot finalizing the physical exchange when they were arrested. Even if Daniels was in the hotel in and around the time of the transaction he was not a part of the actual transaction that occurred in the room and in the parking lot, which served as the basis for the Valona prosecution. Further, the record does not demonstrate that any federal agents observed Daniels at the hotel nor are we moved by Valona's argument that the government could have verified some of his claims regarding Daniels. We believe it is neither incumbent upon the government to undertake such an exercise nor would such verification do any more than supply collateral facts insufficient to overcome the material evidence presented by Schabilion and others. Schabilion's uncontroverted testimony, based upon his firsthand observation, demonstrates Valona's role. (Rapkin, the other firsthand observer, did not testify.) If we were to hold otherwise, our decision would rest on no more than uncorroborated speculation that is neither rooted in actual testimony nor evaluated by a trier of fact. *See Antonino*, 830 F.2d 798 (not enough for defendant to testify evidence might exist, if not corroborated). We are not saying that a defendant may never be able to demonstrate substantial prejudice, but as the *Williams* case demonstrates and we have discussed here, several hurdles must be overcome before this may be accomplished. Valona has not overcome them here. This holding is not to be construed, however, as a ready excuse for the government to justify long pre-indictment delays upon the facile announcement of an explanation. In those cases where substantial prejudice has been shown the government's explanation must be reasonable and must be weighed and considered in the light of all the circumstances in the particular case, including any possible prejudice to the defendant. An explanation found sufficient in one case may not be in the next.

■ Valona also complains that an evidentiary hearing should have been held. "A trial court need only grant an evidentiary hearing on the issue of outrageous government conduct when the defendant has presented specific facts that are sufficient to raise a significant doubt about the propriety of the government's actions." *United States v. Swiatek*, 819 F.2d 721, 725 (7th Cir.1987) (not error to deny request for evidentiary hearing on issue of outrageous government conduct). "Beyond these meager guidelines, however, the determination of whether a hearing is required is necessarily dependent upon the particular facts which attend a particular request, and the district court is properly left with a certain amount of discretion in this regard." *United States v. Losing*, 539 F.2d 1174, 1178 (8th Cir.1976) (hearing not required on motion to suppress), *cert. denied*, 434 U.S. 969, 98 S.Ct. 516, 54 L.Ed.2d 547 (1977). *Accord Solomon*, 688 F.2d at 1178 (the trial court has wide discretion in determining the materiality and relevance of evidence). "An abuse of discretion is established only where no reasonable man could agree with the district court; if reasonable men could differ as to the propriety of the court's action, no abuse of discretion has been shown." *Smith v. Widman Trucking & Excavating Inc.*, 627 F.2d 792, 795–96 (7th Cir.1980). Also, "[t]o establish an abuse of discretion, [the defendant] must show that actual prejudice resulted from the denial." *United States v. Hamm*, 786 F.2d 804, 806 (7th Cir.1986) (denial of continuance did not prejudice defendant as it did not result in ineffective assistance of counsel). "The Court need not hold a hearing on the factual issues presented by the instant motions, but may instead rely on pleadings, exhibits and affidavits in the record as the evidentiary basis for its findings." *United States v. Hutchins*, 489 F.Supp. 710, 711 (N.D.Ind.1980) (evidentiary hearing unnecessary on pretrial motion to dismiss based upon violations of the sixth amendment and the Speedy Trial Act). *Accord United States v. Cohen*, 489 F.2d 945, 952 (2d Cir.1973) (trial court properly relied on the transcript, affidavit, and exhibits in deciding pretrial motion to dismiss based upon double jeopardy); *United States v. Gordon*, 634 F.2d 639, 642 (1st Cir.1980) (trial court could rely on the affidavits and judicial notice to dispose of the pretrial motion alleging violation of double jeopardy). *See also United States v. Fischel*, 686 F.2d 1082, 1095 (5th Cir.1982) (proper to exclude informant as witness in hearing on pretrial motion to dismiss for outrageous government conduct since the court is not required to hold a hearing at all).

The district court has wide discretion in determining how it receives evidence on a motion to dismiss based upon pre-indictment delay. It may hold a hearing, rely on pleadings and affidavits alone, or combine the two. Here the trial court determined that the facts presented by Valona did not demonstrate the need for a hearing and instead found that the evidence demonstrated that Valona had not suffered substantial prejudice and the government had not delayed for an improper purpose. The trial court did not abuse its discretion in denying the request for an evidentiary hearing.

### B. Denied Informant Discovery

■ Before trial, in October 1985, Valona sought an "order disclosing the identity of the informant, ... the prior record, and any and all considerations given to the informant, or anticipated to be given to the informant by the government, as well as providing defense counsel an opportunity to interview the informant." In July 1986 Valona sought "any and all performance records of the confidential informant Arthur Rapkin [a]nd any and all notes and memorandum of any conversation between any law enforcement officers and Arthur Rapkin, prior to and during, Rapkin's involvement in any events that led to the arrest of James Valona on May 11, 1983."

The government neither opposed the disclosure of Rapkin's identity nor the interviewing of Rapkin. Due to the government's acquiescence, the trial court (adopting the magistrate's recommendation) determined an order on the identity-interview request was unnecessary. The trial court

(again, adopting the magistrate's recommendation), nevertheless, did deny without prejudice Valona's request for information regarding Rapkin's "prior record" and information regarding the consideration paid to Rapkin, "absent a particularized need."

Valona claims he was entitled to Rapkin's criminal record and record of his performance as an informant in order to impeach the hearsay declarations of Rapkin: "[G]overnment witnesses on numerous occasions, both on direct and cross-examination, testified to statements made by Rapkin, including statements that Valona was willing to purchase 10 kilograms of cocaine from Schabilion for $450,000." Although Valona has characterized this argument as an improper limitation of discovery his argument truly complains of an improper limitation of discovery and a concomitant inability to introduce necessary impeachment evidence.

"The district court has wide discretion within the rules to determine the manner and course of discovery." *Eggleston v. Chicago Journeymen Plumbers' Local Union No. 130, U.A.*, 657 F.2d 890, 902 (7th Cir.1981), *cert. denied*, 455 U.S. 1017, 102 S.Ct. 1710, 72 L.Ed.2d 134 (1982). "A trial court's limitation on the manner and course of discovery will be reversed by this Court only upon a showing that the limitation 'is improvident and prejudices a party's substantial rights.'" *Brown–Bey v. United States*, 720 F.2d 467, 471 (7th Cir.1983) (quoting *In re Rassi*, 701 F.2d 627, 631 (7th Cir.1983)).

As in discovery matters, our review of evidentiary rulings is governed by the abuse of discretion standard. *United States v. Abayomi*, 820 F.2d 902, 905 (7th Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 189, 98 L.Ed.2d 142 (1987). "Under the 'abuse of discretion' standard of review, the relevant inquiry is not how the reviewing judges would have ruled if they had been considering the case in the first place, but rather, whether *any* reasonable person could agree with the district court." *Deitchman v. E.R. Squibb & Sons, Inc.*, 740 F.2d 556, 563 (7th Cir.1984) (emphasis in original). "In other words 'if reasonable men could differ as to the propriety of the [district] court's action, no abuse of discretion has been shown.'" *Abayomi*, 820 F.2d at 905 (bracket in original) (quoting *Smith v. Widman Trucking and Excavating, Inc.*, 627 F.2d 792, 796 (7th Cir.1980)).

Appellant has left the impression that substantial weighty hearsay statements of Rapkin were interjected at trial and seriously affected the decision-making process. After a thorough review of the transcript we can see this exaggerates the extent of the Rapkin hearsay before the jury. It is true that agent Schabilion testified Rapkin stated that the defendant "would have monies at a place to exchange for whatever." However, this is not the same as testifying that Rapkin stated "Valona was willing to purchase 10 kilograms of cocaine from Schabilion for $450,000[,]" the characterization of the statement given in Valona's brief before this court. This is the only statement that even begins to suggest that an inability to fully impeach prejudiced Valona. Even if we imply that "whatever" was simply another way of describing cocaine, such an indefinite term is not the stuff of reversal. In fact, even if we attributed more probative value to this statement than it merits, it is obvious that Valona's counsel had sufficient opportunities to impeach this statement. In large measure Valona's counsel took advantage of these opportunities.

Defense counsel elicited information regarding Rapkin's status during his cross-examination of Schabilion. Schabilion testified that he knew Rapkin was to receive ten percent of whatever money was recovered from Valona and that Rapkin ultimately was paid $40,000–$45,000 for his part in the Valona matter. During cross-examination of Hehr defense counsel again elicited the ten percent and $40,000–$45,000 figures. Hehr also testified that no pending criminal charges against Rapkin figured into the deal. (This merely reemphasized the direct examination, in which the government's counsel elicited testimony from Hehr that Rapkin was to receive ten percent and ultimately received approximately $45,000 for his role in the Valona matter.)

Also, during the Schabilion cross-examination, out of the jury's presence, Rapkin's role in "sting operations" involving persons besides Valona was discussed. Defense counsel argued that these stings as well as the Valona matter were merely revenue-generating operations. The trial court determined information regarding the other stings was irrelevant to the Valona prosecution. At a later stage of the trial, again out of the jury's presence, the trial judge instructed defense counsel that he could "go into any of the arrangements that Mr. Rapkin had with the government as it pertains to Mr. Valona." The trial court again denied the request to go into other Rapkin-government arrangements, determining that they were irrelevant to the Valona sting and prosecution. In addition, at the point the government rested its case, defense counsel stated that "I discussed with Mr. Rapkin and made the decision some time ago, but only just now told his lawyer ... that I was not calling Mr. Rapkin, although I had made that decision long before today." Finally, in closing argument defense counsel stated "it was within my ability to bring Arthur Rapkin into the courtroom. But rest assured I wasn't going to do it. Because based upon the picture that I have heard in the last two days about Arthur Rapkin, it was a foregone conclusion that Mr. Rapkin would not have helped me. Sight unseen, he would not have helped me. He received $45,000." Neither the government nor Valona called Rapkin as a witness.

Before the jury were the details of the Rapkin-government deal, including the $45,000 payment and the lack of any pending criminal charges against Rapkin. Defense counsel interviewed Rapkin and had an opportunity to call Rapkin as a witness and decided not to. Counsel argued against Rapkin's credibility in closing. Numerous times before and during trial the trial court heard arguments and considered the necessity of exploring further information regarding Rapkin. It appeared that defense counsel wished to use information of other Rapkin-government agreements to show that the government's prosecution of Valona was, like these several other arrangements, a ploy to make money for the government and not to convict drug traffickers. The trial court determined that these other agreements were irrelevant to the Valona prosecution.

We believe that the trial judge could properly find that some tenuous money making allegation was not relevant to whether or not Valona had attempted to purchase ten kilograms of cocaine. Likewise, Valona has not demonstrated that the trial judge abused his discretion when he restricted the use of prior crime evidence. "The trial court does not abuse its discretion when it precludes cumulative and confusing cross-examination into areas already sufficiently explored to permit the defense to argue personal bias and testimonial unreliability." *United States v. Robinson,* 832 F.2d 366, 373 (7th Cir.1987) (trial court limited cross-examination of informant). *See United States v. Hinton,* 683 F.2d 195, 200 (7th Cir.1982), *aff'd sub nom. Dixon v. United States,* 465 U.S. 482, 104 S.Ct. 1172, 79 L.Ed.2d 458 (1984). The trial court has not abused its discretion: it properly limited both the scope of discovery and the use of impeachment material.

### C. Outrageous Conduct

■ Valona claims the government acted outrageously because it recruited and transported Rapkin to Wisconsin specifically to work on Valona's case, and agreed to pay Rapkin a fee of ten percent of whatever was recovered. In addition, Schabilion, the government agent, supplied the cocaine sample. Lastly, Valona argues that he did not ask for the sample, but was informed that a sample had been prepared for his evaluation. This, according to Valona, is outrageous conduct, and outrageous conduct requires reversing the conviction on due process grounds.

In a recommendation filed May 6, 1986, the magistrate recommended that Valona's motion to dismiss because of the government's so-called outrageous conduct and his motion for an evidentiary hearing regarding this conduct both be denied. The trial judge adopted the magistrate's recom-

mendation. At the close of trial the trial judge denied Valona's motion for a judgment of acquittal notwithstanding the verdict, finding the claim of outrageous conduct was moot.

In a recent opinion this court outlined the Seventh Circuit's view of an outrageous conduct claim.

> The doctrine of outrageous government conduct stems from a statement in *United States v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973), a case involving the entrapment defense. The Supreme Court found that the defendant in *Russell* was predisposed to commit the crime at issue, and therefore was not entrapped. However, the Court noted that it might "some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *Id.* at 431–32, 93 S.Ct. [at] 1643. This circuit has also left the possibility open, although we have never reversed a conviction on this ground. *United States v. Bruun*, 809 F.2d 397, 409 (7th Cir.1987).

*United States v. Swiatek*, 819 F.2d 721, 725 (7th Cir.1987).

■ It is clear that situations, as in the present case, which involve pre-targeting of a defendant, the mere furnishing of a sample, and a contingent fee arrangement, do not call for the activation and application of the outrageous conduct concept. Instead, the governmental actions here may fit into an entrapment analysis[2] or simply serve as credibility factors that should be left to the trier of fact. Nevertheless we shall discuss the outrageousness concept to demonstrate that even if we activated the outrageousness theory here it would provide Valona no relief.

This court has noted the following:

> [A]n examination of the post-*Hampton* cases decided by the courts of appeals indicates that due process grants wide leeway to law enforcement agencies in their investigation of crime. Assuming that no independent constitutional right has been violated, governmental misconduct must be truly outrageous before due process will prevent conviction of the defendant.

*United States v. Kaminski*, 703 F.2d 1004, 1009 (7th Cir.1983). *Accord United States v. Belzer*, 743 F.2d 1213, 1217 (7th Cir. 1984), *cert. denied sub nom. Clements v. United States*, 469 U.S. 1110, 105 S.Ct. 788, 83 L.Ed.2d 781 (1985).

> [I]n evaluating whether government conduct is outrageous the court must consider the nature of the crime and the tools available to law enforcement officers to combat it. [*United States v. Twigg*], 588 F.2d [373], 378 fn. 6 [ (3d Cir.1978) ] citing *Hampton [v. United States]*, 425 U.S. [484,] 495–96 fn. 7 [96 S.Ct. 1646, 1653 n. 7, 48 L.Ed.2d 113] [ (1976) ].

*United States v. Bounos*, 730 F.2d 468, 470 (7th Cir.1984).

■ The issue of outrageous conduct would not be a jury question. *Swiatek*, 819 F.2d at 726 ("Whether the government has stepped beyond permissible constitutional bounds in attempting to enforce the law is a legal question, not a factual one."). We review legal determinations by a district court de novo. *See S.E.C. v. Suter*, 732 F.2d 1294, 1300 (7th Cir.1984) ("An appellate court may properly conduct an independent review and resolution of questions of law determined by a district court.... Conclusions of law made by a district court do not bind a reviewing court.").

■ The courts that have dealt with the propriety of "pre-targeting" a defendant typically consider the contingent nature of

---

2. An ordinary entrapment claim, in great part, provides the necessary protection to a defendant's legitimate interests. However, the entrapment argument has not been raised in this appeal. Nevertheless, considering entrapment *sua sponte*, we find that the record does not show that the government entrapped Valona because

of his obvious predisposition to commit the crime. *See e.g., United States v. Russell*, 411 U.S. 423, 429, 93 S.Ct. 1637, 1641, 36 L.Ed.2d 366 (1973) ("[The entrapment defense] focus[es] on the intent or predisposition of the defendant to commit the crime.").

any arrangement with an informant involved in the pre-targeting. This is so because it is not the pre-targeting in and of itself that may demonstrate any illegal outrageousness of the government's action, but instead it is the government's offering, for example, an inducement to an informant contingent upon the informant's ability to bring about the *conviction* of the targeted defendant. However, in this circuit pre-targeting combined with a contingent fee arrangement is not per se considered to be outrageous. *United States v. Hodge*, 594 F.2d 1163, 1166 (7th Cir.1979) (not a due process violation where "paid informant ... compensated if he contacted and made purchases from 'anyone within their ... organization that deals in narcotics' "). Another circuit has opined that an important prerequisite to demonstrating the outrageousness of a contingent fee agreement is a showing that the contingently-motivated informants were called as government witnesses. *United States v. Rey*, 811 F.2d 1453 (11th Cir.1987), *petition for cert. denied*, —— U.S. ——, 108 S.Ct. 103, 98 L.Ed.2d 63 (1987).[3]

Other circuits do not consider any type of witness contingent fee arrangement outrageous and instead allow the jury to consider the fee arrangement in its evaluation of witness credibility. *See United States v. Cervantes–Pacheco*, 826 F.2d 310 (5th Cir.1987) (en banc); *United States v. Cresta*, 825 F.2d 538 (1st Cir.1987); *United States v. Spector*, 793 F.2d 932 (8th Cir. 1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 876, 93 L.Ed.2d 830 (1987). In fact, for this circuit, the *Hodge* court opined that in the case before it, which did not represent outrageous conduct, "[t]he method of payment is properly a matter for the jury to consider in weighing the credibility of the informant." 594 F.2d at 1167. Treating fee arrangements with witness/informants as a credibility factor for the jury rather than an outrageous conduct issue appears to be a more reasoned approach. Here it does not matter whether we apply the *Rey* reasoning or treat the fee arrangement as a

credibility factor, Valona could not prevail since Rapkin was not called as a governmental witness. In addition, Rapkin received his fee well before trial and it was not in any way contingent upon the trial outcome. The addition of a pre-targeting claim does not change the outcome. Rapkin "was not a bounty hunter out to trap specific *innocent* victims," but instead the Hehr affidavit demonstrates that government agents had reason to believe Valona was involved in drug trafficking. *Id.* (emphasis added).

Valona also complains that the government's supplying of a three and one-half gram cocaine sample to Valona, a sample Rapkin told Valona was available, was outrageous and violative of due process. In *Bounos*, this court again referred to the *Twigg* opinion in discussing the government's supplying of items used in the defendant's commission of a criminal offense:

> *Hampton* was concerned with the sale of an illegal drug, a much more fleeting and elusive crime to detect than the operation of an illicit drug laboratory. In such a situation the practicalities of combating drug distribution may require more extreme methods of investigation, including the supply of ingredients which the drug ring needs. [*Twigg,*] 588 F.2d at 378.

*Bounos*, 730 F.2d at 470.

■■■■■■ It is clear that the government may supply drugs to a suspect in a drug investigation. *Hampton v. United States*, 425 U.S. 484, 491, 96 S.Ct. 1646, 1650, 48 L.Ed.2d 113 (1976) (Powell, J., concurring) (defendant supplied with actual contraband convicted of selling). This is especially true where the government supplies only a small amount. *United States v. Buishas*, 791 F.2d 1310, 1314 (7th Cir.1986) (supplied with sixty-nine gram sample of marijuana, which was not the contraband the defendant was convicted of conspiring to sell). Even though such supplying may be legitimate, this court has stated in the past that it will closely examine government conduct

---

**3.** A footnote in the *Rey* decision gives a thorough review of the Eleventh Circuit's (and former Fifth Circuit's) case law regarding the pre-selection/contingency determination. 811 F.2d 1453, 1456 n. 3.

when the government supplies the contraband. *United States v. Thoma,* 726 F.2d 1191, 1199 (7th Cir.), *cert. denied,* 467 U.S. 1228, 104 S.Ct. 2683, 81 L.Ed.2d 878 (1984). In our recent *Buishas* case, this court found that "the government's conduct ... in delivering ... small samples of marijuana ..., which were requested by a target of the investigation and were reasonably necessary to the completion of the sting operation, was [not] so outrageous as to violate due process...." 791 F.2d at 1314. *Buishas* is distinguishable only in that the defendant in that case requested the sample and here it appears that Rapkin told Valona a sample was available. That difference is insignificant. The facts here and in *Buishas* fall well short of suggesting a possible due process violation. Also in such cases we would consider the practical necessity of this type of police work. Large scale drug stings will likely not succeed without the provision of small samples, a typical preliminary stage in such drug trafficking.

## III. CONCLUSION

We are not persuaded by any of the three claims of error raised by Valona, which rest primarily on a due process foundation. Rapkin, like other informants, provided critical assistance in a law enforcement investigation. Often part of the inducement to informants such as Rapkin is a promise of confidentiality. Time and again courts have upheld the propriety of such promises. Of course such promises must give way when critical rights to a fair trial will be impaired. In such a case the government is faced with the decision of either disclosing the identity of the informant or not pursuing the criminal prosecution. Here for a time the government chose the former: it refrained from prosecuting Valona, in order to protect Rapkin's identity. Once the prosecution did commence, the trial court carefully considered informant Rapkin's role in the sting operation, including the government's promise of confidentiality, which led to the pre-indictment delay. The trial court determined that this did not substantially prejudice Valona. Also, the court allowed disclosure of

Rapkin's identity and details of the Rapkin-government agreement to be presented to the jury, even though Rapkin did not testify. Finally, the combination of Rapkin's activities and the government's conduct in the investigation does not invoke some separate outrageous conduct concept. Neither the actions of the government nor those of the trial court transgressed due process guarantees.

AFFIRMED.