UNITED STATES of America, Appellee,

v.

William George FORD, Appellant.

No. 90–5028MN.

United States Court of Appeals, Eighth Circuit.

Submitted Aug. 15, 1990.

Decided Nov. 15, 1990.

Douglas Peine, for appellant.

Thor Anderson, for appellee.

Before JOHN R. GIBSON and MAGILL, Circuit Judges, and HEANEY, Senior Circuit Judge.

MAGILL, Circuit Judge.

William Ford appeals his conviction for aiding and abetting the distribution of heroin and for distributing heroin, both in violation of 21 U.S.C. § 841(a)(1), and the resulting sentence imposed. Ford argues on appeal that he was entrapped as a matter of law, that the government's conduct was so outrageous that he should not be prosecuted, and that he was denied effective assistance of counsel. Because Ford was predisposed to commit the offenses for which he was convicted and the government's conduct was not outrageous, we affirm the conviction. We reverse and remand Ford's sentence for a determination of acceptance of responsibility and dismiss his other ineffectiveness of counsel claim because it is premature.

## I.

Ford's conviction arose from an undercover police operation that resulted in the indictment and conviction of ten members of a drug distribution ring. Ford became a target of the operation after a confidential informant provided the police with information about Ford's drug involvement. The informant set up a meeting between Eugene Leatherman, a special agent with the Minnesota Bureau of Criminal Apprehension, and Ford on April 25, 1988. At this meeting Leatherman sought to purchase heroin from Ford. Ford told Leatherman that he needed the money before Leatherman would get the heroin. Leatherman gave Ford $800 and Ford left the area. Ford returned a short time later and gave Leatherman a package that contained .7 grams of black tar heroin. Leatherman then told Ford he would like to do future deals with him; Ford agreed and gave Leatherman his phone number.

The next day Leatherman called the phone number Ford had given him and discussed purchasing more drugs. Ford met Leatherman in a convenience store parking lot and agreed to sell the officer 2.92 grams of heroin for $1,950. To assure Leatherman that he would not be cheated, Ford suggested that Leatherman could observe Ford's meeting with his heroin source. After contacting the source, Ford and Leatherman traveled together to an arranged meeting place. Ford entered the source's car, and emerged a short time later. He told Leatherman there had been a mix-up about the quantity of drugs Leatherman wanted, and that the source had to obtain more heroin. After the source returned, Ford again joined him in his car, and instructed Leatherman to follow them. Both cars eventually stopped in a convenience store parking lot. Ford left the source's car and rejoined Leatherman. He then gave Leatherman a plastic bag containing black tar heroin.

After this transaction, Leatherman instructed the confidential informant to tell Ford to contact the officer. Sometime within the next two days, Ford paged Leatherman, leaving a number for Leatherman to call. Leatherman called the number and the two discussed another drug purchase. On April 28, 1988, Ford and Leatherman again met in a convenience store parking lot where Leatherman paid Ford $1,950 and received 2.82 grams of black tar heroin. Ford mentioned that his source for this transaction was his former girlfriend, who also had supplied the heroin to Ford's previous source. Leatherman expressed an interest in meeting Ford's former girlfriend, and suggested that Ford arrange a meeting for the three of them. Ford agreed and also said he wanted to reconcile with his former girlfriend.

On May 5, 1988, Ford again paged Leatherman. During the ensuing conversation, the two discussed another heroin purchase. Ford told Leatherman he would obtain the heroin. This deal was never consummated, however, and neither party ever contacted the other again.

In August 1988, the confidential informant introduced another undercover police officer, Hennepin County Sheriff's Department Deputy Thomas Rainville, to Ford. At their initial meeting, Ford gave Rainville his telephone number. Rainville called Ford on August 11, 1988 and asked Ford to "cover" him on a cocaine deal. Rainville explained that his "buyer" had not paid him in full for the last deal and that he wanted Ford to serve as extra protection in case anything went wrong. Ford agreed to assist Rainville in exchange for $500. On the way to the transaction, which was actually staged by undercover officers, Ford informed Rainville that he had served as protection many times in the past, in particular for his former girlfriend, and that at one time he had been involved in a $50,000 heroin transaction. Rainville then told Ford he wanted to purchase heroin from him, and eventually exchange cocaine for heroin as well. Ford informed Rainville that he could set up a heroin purchase for later that evening. The staged transaction then took place and Rainville paid Ford the $500.

Rainville contacted Ford again on August 18, 1988 and they discussed a heroin purchase. Ford stated he was having prob-

lems with his source, but that he had another source who could supply the heroin and would contact Rainville after he had made the necessary arrangements. Ford later paged Rainville and the two arranged the heroin deal. Rainville met with Ford and Ford's sister and they traveled to the site of the deal. Ford mentioned that he was using a new source this time, one that his sister was familiar with, and that she would act as the go-between. Rainville then gave Ford's sister $1,200 and Ford stated that she would have to go and obtain the drugs. Another mix-up concerning drug quantity occurred and Ford and Rainville traveled to another location to wait for the source. While they were waiting, Ford gave Rainville a small quantity of heroin as a sign of good faith. The two discussed future heroin transactions before Ford finally obtained 2 grams of heroin. After giving Rainville the heroin, Ford stated that he wanted his share of the deal. Rainville first gave Ford $50, but after Ford complained, Rainville gave him another $50. Ford also asked Rainville for some of the heroin. Rainville refused, stating that he already had a buyer lined up for that exact quantity. Ford then asked Rainville to return the sample of heroin he had earlier given the officer so he could sell it and make some money. Rainville gave the sample back to Ford. The two continued to discuss future drug deals, and Ford expressed interest in robbing any dealers who Rainville thought would be good targets.

Ford paged Rainville on August 26, 1988, and in the ensuing conversation asked Rainville if he was interested in purchasing heroin. In a subsequent conversation, Ford told Rainville that he knew people who were interested in purchasing cocaine from the officer, and that they wanted a small sample. Rainville stated that he did not have any cocaine just then. Rainville and Ford met later that day and negotiated a heroin purchase: Rainville would pay Ford $3,500 for 7 grams of heroin. Ford told Rainville that his source for this deal was the same as his source for the August 18, 1990 deal, but that he had not included his sister this time. Rainville and Ford parted company, but later Ford again paged Rainville. Ford told Rainville the deal was ready and again asked for a sample of Rainville's cocaine for his connections. They met again, and Ford asked for the $3,500 in advance. Rainville refused, and they eventually agreed that Rainville would first give Ford $1,500 for 3 grams, and then $2,000 for the remaining 4 grams. Rainville also gave Ford a small quantity of cocaine for him to take to his source. Ford asked for a percentage of the deal. Rainville refused. Ford then asked for some heroin. Rainville refused the heroin request, but did give Ford $100.

Two days later, on August 28, 1988, Ford again contacted Rainville. He told the officer that he had friends who wished to purchase 2 kilos of cocaine. Rainville said he was reluctant to partake in such a large transaction without knowing anything about the buyers. The next day Ford called Rainville and told him that the cocaine deal had fallen through.

Ford contacted Rainville another time on August 30, 1988. Ford asked Rainville to give him $100, without specifying a reason for his request. Rainville reluctantly agreed and met with Ford later that day. At the meeting, Ford acted strangely and demanded that Rainville give him some heroin. Rainville refused, and Ford asked for the $100 instead. Rainville agreed to give him the money if Ford would procure an untraceable handgun for the officer. Rainville then gave Ford the money, although Ford never procured a handgun for him.

On September 13, 1988, Ford paged Rainville after the officer had left a message for him. They arranged another heroin purchase for later that day. Rainville met Ford and another woman in the parking lot of a fast-food restaurant and agreed to exchange $1,100 for 2 grams of heroin. Ford informed Rainville that the heroin was under a nearby rock. After Rainville picked up the heroin, he gave Ford the money. The two discussed another heroin deal before parting company. Rainville soon discovered that the quantity of heroin he had obtained was not 2 grams, but 1 gram. He contacted Ford and informed him of the discrepancy. Ford replied that

his female companion must have made a mistake. Rainville told Ford that the next time they were involved in a deal, Ford should make up the difference. There were no additional transactions after this date.

Ford was arrested on December 14, 1988 and charged with three counts of aiding and abetting the distribution of heroin and three counts of distributing heroin. At trial the transactions described above were related at length. The undercover officers testified, as did other members of the team that surveilled the transactions. Deputy Rainville testified on cross-examination that he was aware that Ford was a heroin addict during the course of their transactions. The government's expert testified that heroin dealers are generally also heroin users, and deal heroin in part to finance their habit. The expert also stated that to catch large-scale heroin dealers, it was necessary to investigate the users who deal as well. The expert testified further that although undercover officers try to avoid giving anyone a sample of the drugs, sometimes it is necessary to create trust and facilitate the undercover relationship.

Ford testified on his own behalf at trial. Ford, who was forty-eight years old, stated that he had been involved with drugs since the age of eighteen, and that he was a heroin addict. Ford testified that he personally used the heroin and cocaine samples that Deputy Rainville gave him. He also testified that he used the $100 that he received from Rainville on August 26, 1988 to purchase drugs for personal use. While on the stand, Ford also testified about his thirty-year involvement with crime. He discussed his other convictions, including one for conspiracy to commit armed robbery, one for aggravated robbery, and two for heroin distribution. Ford also described his life as a street hustler who "connected" individuals buying and selling contraband, his knowledge of the local drug scene, and his participation in five shootouts with the police. Throughout his testimony, Ford contended that he only became involved with Leatherman and Rainville as favors to friends, who in fact were the confidential informants. Ford also repeatedly contended that he was merely a heroin user, not a heroin dealer.

The jury found Ford guilty on all six counts and rejected Ford's proffered entrapment defense. The district court, pursuant to the Federal Sentencing Guidelines, sentenced Ford to six concurrent 300–month terms of imprisonment, and a $300 special assessment. In its Statement of Reasons for Sentence Imposed, the district court stated that Ford was sentenced to 300 months' imprisonment because he was a career offender and had committed a series of serious offenses that involved heroin. Ford now appeals this conviction.

## II.

### A. Entrapment

Ford's first argument on appeal is that he was entrapped as a matter of law. He contends that the government used his addiction and the loyalty he felt for his friends to turn him from a drug addict into a drug dealer. Entrapment as a matter of law exists where the evidence establishes that the "government agent originated the criminal design; that the agent implanted in the mind of an innocent person the disposition to commit the offense; and that the defendant then committed the criminal act at the urging of the government agent." *United States v. Shaw*, 570 F.2d 770, 772 (8th Cir.1978) (citations omitted); *accord United States v. Richard*, 872 F.2d 253, 254 (8th Cir.1989). The critical question in the entrapment analysis is "whether the government agent caused or induced the defendant to commit a crime he was not otherwise predisposed—*i.e.*, willing and ready—to commit whenever a propitious opportunity arose." *United States v. Lard*, 734 F.2d 1290, 1293 (8th Cir.1984); *accord Richard*, 872 F.2d at 254. To determine whether a defendant was predisposed, this court must examine "the defendant's personal background, character, and state of mind, as well as the extent to which the government agent instigated or induced the criminal act." *United States v. King*, 803 F.2d 387, 390 (8th Cir.1986) (citing *United States v. Dion*, 762 F.2d 674, 686–88 (8th

Cir.1985), *rev'd on other grounds*, 476 U.S. 734, 106 S.Ct. 2216, 90 L.Ed.2d 767 (1986)). "Determining a defendant's predisposition requires examination of the defendant's personal background to see 'where he sits on the continuum between the naive first offender and the streetwise habitue.'" *Lard*, 734 F.2d at 1293 (quoting *United States v. Townsend*, 555 F.2d 152, 155 n. 3 (7th Cir.), *cert. denied*, 434 U.S. 897, 98 S.Ct. 277, 54 L.Ed.2d 184 (1977)).

Although the jury rejected Ford's entrapment defense, he contends that the evidence clearly establishes entrapment. Ford's evidence includes: that Ford lived like a drug addict, not a drug dealer; that the manner of the drug transactions shows that Ford was an addict, not a dealer; that Ford was simply doing favors for friends; and that the officers instigated and directed the drug purchases, taking advantage of Ford's addiction. We view this evidence in the light most favorable to the government in deciding whether or not entrapment exists as a matter of law. *See United States v. Pfeffer*, 901 F.2d 654, 656 (8th Cir.1990).

■ A review of the evidence establishes that Ford was predisposed to sell heroin and assist others in selling heroin. After the police initiated contact through the informants, Ford was always willing and ready to sell the undercover officers heroin. This is evidence of predisposition. *See United States v. Rodriguez*, 915 F.2d 397, 399 (8th Cir.1990). The undercover officers did not coerce Ford into doing something he did not want to do, but merely provided Ford with the opportunity to sell heroin. Such conduct alone is insufficient to support entrapment as a matter of law. *See United States v. Jacobson*, 916 F.2d 467, 470 (8th Cir.1990) (en banc). That Ford was an addict is also evidence of predisposition, based on the expert's evidence that heroin users are often heroin dealers as well. Moreover, in *United States v. Resnick*, 745 F.2d 1179 (8th Cir. 1984), we rejected an entrapment defense based solely on the defendant's addiction to cocaine. The defendant in *Resnick* argued, as Ford does here, that the government's "initiation of the cocaine sales was impossi-

ble for him to resist," and that the defendant "was a willing participant only to the extent that he could not control his habit." *Id.* at 1186. The record in *Resnick* showed, however, that the defendant provided the government with alternate drug sources, arranged the drug transactions, and told the undercover officer he had been selling drugs for a number of years. *Id.; see also United States v. Williams*, 873 F.2d 1102, 1104 (8th Cir.1989) (rejecting entrapment defense where defendant claimed he was drug user, not a drug dealer, but other evidence indicated predisposition). The record in this case is strikingly similar to that in *Resnick:* Ford also provided the government with alternate drug sources, arranged the transactions, and informed Rainville of his prior involvement with drug dealing.

■ The manner of the drug transactions, namely that Ford asked for the purchase money before distributing the heroin, also indicates predisposition because, as the government's expert testified, experienced and cautious drug dealers often ask buyers to "front" the purchase money. Furthermore, an examination of Ford's personal background reveals a thirty-year involvement with crime, and with heroin dealing in particular. Ford's final testimony on cross-examination reveals his continued adherence to the "street life." When asked by the government to name his drug sources, Ford replied, "If it took me the rest of my life, I would not sit up and tell you who has done me favors when I was sick." On the continuum from "naive first offender" to "street wise habitue," Ford falls squarely on the "habitue" end.

■ Ford's other evidence of entrapment, his belief that he was doing favors for friends, is identical to evidence this court discounted in *Williams* and *King*. In *Williams*, the defendant claimed he was entrapped because the government's informer used their friendship to entice the defendant to sell cocaine. *Williams*, 873 F.2d at 1104. Similarly, the defendant in *King* claimed that an informant used the defendant's friendship with the informant's brother as an inducement to sell the infor-

mant drugs. *King,* 803 F.2d at 390. In both cases we rejected this sort of entrapment evidence and determined that entrapment as a matter of law was not present. *Williams,* 873 F.2d at 1104; *King,* 803 F.2d at 390. Therefore, Ford's friendship with the confidential informant is not evidence of entrapment.

Based on the record in this case, we conclude that sufficient evidence of Ford's predisposition to traffick in heroin exists and that Ford was not entrapped as a matter of law.

### B. Outrageous Government Conduct

Ancillary to Ford's entrapment defense is his argument that the government's conduct in this case was so outrageous that he should not be prosecuted. This "outrageous conduct" defense is separate from an entrapment defense and was first announced in *United States v. Russell,* 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973). In *Russell,* the Supreme Court noted that it "may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *Id.* at 431–32, 93 S.Ct. at 1643 (citations omitted). To prevent prosecution, the government's conduct must violate "that 'fundamental fairness, shocking to the universal sense of justice,' mandated by the Due Process Clause of the Fifth Amendment." *Id.* at 432, 93 S.Ct. at 1643 (quoting *Kinsella v. United States ex rel. Singleton,* 361 U.S. 234, 236, 80 S.Ct. 297, 4 L.Ed.2d 268 (1960)). Ford argues that Deputy Rainville's providing him with heroin and cocaine, knowing that he was an addict, was designed to convert him from drug addict to drug dealer and hence was outrageous. The government responds that giving Ford a small quantity of cocaine and a small quantity of heroin was a prudent and necessary response to the exigencies of the drug trafficking world. We agree with the government.

Our decision in *United States v. Musslyn,* 865 F.2d 945 (8th Cir.1989), sup-ports the conclusion that Ford's outrageous conduct defense should be rejected. In *Musslyn,* we stated that where a defendant is predisposed to commit a crime, " 'investigative officers and agents may go a long way in concert with the defendant without being deemed to have acted so outrageously as to violate due process.' " *Musslyn,* 865 F.2d at 947 (quoting *United States v. Irving,* 827 F.2d 390, 393 (8th Cir.1987)). As discussed above, the evidence strongly shows that Ford was predisposed to sell heroin. We also emphasized in *Musslyn* that the nature of the crime must be considered when reviewing undercover conduct for outrageousness. *Id.* at 947. Ford's conviction was the result of a major undercover police operation. The Supreme Court has expressly recognized that such operations may be the only effective means for detecting drug offenses. *See Russell,* 411 U.S. at 432, 93 S.Ct. at 1643. Were we to accept Ford's argument, we would prevent the government from making the accommodations needed to function effectively in the drug culture. Furthermore, we would provide drug dealers with an easy means for determining whether a potential drug buyer is an undercover agent. For example, if we prevent undercover officers from ever giving quantities of drugs to drug sellers who were also drug addicts, any dealer would easily be able to avoid arrest by informing potential purchasers of their addiction, real or phony, and asking for a sample of the drug. If the purchaser refuses, the dealer would likely conclude that the purchaser is a police officer, and refuse to sell the drugs. Thus, the efficacy of undercover operations would be greatly reduced and undercover agents would be seriously compromised.

Further militating against acceptance of Ford's outrageous conduct offense is our decision in *Gunderson v. Schlueter,* 904 F.2d 407 (8th Cir.1990). In *Gunderson,* we noted that the Eighth Circuit has never reversed a conviction because of outrageous undercover conduct. *Gunderson,* 904 F.2d at 410 & n. 8. We determined that the undercover officers' conduct in *Gunderson,* although objectionable, "did not rise to the high level needed to prove a

due process violation." *Id.* at 411. Therefore, although some may object to the government's providing Ford with drugs, this sort of intangible feeling alone does not support the finding of outrageous conduct.

We hold, therefore, that an undercover officer's providing a known addict with small quantities of drugs to facilitate and enhance the undercover relationship does not constitute outrageous conduct.

## C. Ineffective Assistance of Counsel

██ Ford's next argument on appeal is that he was denied the effective assistance of counsel because his trial attorney did not object to the parole officer's neglecting to reduce Ford's base offense level under the sentencing guidelines for acceptance of responsibility. Normally such a claim would be considered premature because it is more properly raised first in a collateral proceeding pursuant to 28 U.S.C. § 2255. *United States v. Lewin,* 900 F.2d 145, 149 (8th Cir.1990). A collateral proceeding is needed because usually such a claim cannot be developed without examining facts not in the appellate record. *Id.* (citations omitted). In this unique case, however, all the relevant facts are known and the government does not object to the claim.

A month prior to Ford's sentencing, Congress amended the guidelines to permit a court to reduce a career offender's base offense level by two points if the career offender accepts responsibility for his crimes. *See* U.S.S.G. § 4B1.1. At the time Ford's presentence report was prepared, this reduction was not possible and, even though the report noted a two-point reduction in Ford's base offense level on the drug convictions was applicable, because Ford was a career offender, no reduction was provided. The district court accepted the probation officer's findings, to which Ford's trial counsel did not object. Ford argues that his trial counsel's performance at the sentencing hearing violates the standards established in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1983). The first *Strickland* requirement mandates a showing that

counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. Ford's trial counsel's failure to object at the sentencing hearing to a base offense level was equivalent to Ford's having no trial counsel at all. Therefore, the first standard is satisfied. The second *Strickland* requirement mandates a showing "that counsel's errors were so serious as to deprive the defendant of a fair trial." *Id.* In Ford's case, counsel's error was so serious that it deprived Ford of a fair sentence. Had Ford's trial counsel objected to the base offense level of 34, it is possible the district court would have modified the level to reflect Ford's acceptance of responsibility. Ford's original sentence, 300 months, is thirty-eight months longer than the maximum sentence resulting from a base offense level of 32. Counsel's error had an effect on Ford's sentence, and therefore we reverse Ford's sentence and remand for a determination of the acceptance of responsibility issue.

Ford's second ineffectiveness claim, which concerns his trial counsel's failure to request a downward departure pursuant to § 4A1.3 of the guidelines, does require a review of facts outside the record and thus is premature.

## III.

For the reasons given, we affirm Ford's conviction for selling heroin, and for aiding and abetting the sale of heroin. We reverse Ford's sentence on the acceptance of responsibility issue, however, and remand for proceedings consistent with this opinion.