**UNITED STATES of America,**
**Plaintiff–Appellant,**

v.

**Chris D. HARRIS, Defendant–Appellee.**

**No. 92–4001.**

United States Court of Appeals,
Tenth Circuit.

July 1, 1993.

---

Bruce C. Lubeck (David J. Jordan, U.S. Atty., with him on the brief), Asst. U.S. Atty., Salt Lake City, UT, for plaintiff-appellant.

Manny Garcia, Salt Lake City, UT, for defendant-appellee.

Before MCKAY, Chief Judge, SETH, Senior Circuit Judge, and BRORBY, Circuit Judge.

BRORBY, Circuit Judge.

The United States appeals the dismissal of Counts II and III which charged Defendant/Appellee Chris Harris (Defendant) with aiding and abetting in the distribution of crack cocaine in violation of 21 U.S.C. § 841(a)(1) and § 841(b)(1)(B) and 18 U.S.C. § 2. The district court dismissed the indictments *sua sponte* holding the police officer engaged in outrageous government conduct. We reverse.

## I. BACKGROUND

Defendant's three counts arose from his facilitation of the purchase of crack cocaine for undercover agent, Edward Lucas. Detective Lucas worked for the Salt Lake Metropolitan Narcotics Strike Force and functioned in an undercover capacity from January 1990 to July 1991. During the undercover operations Detective Lucas had contact with hundreds of individuals and obtained warrants for at least 150 suspects. Detective Lucas was introduced to the Defendant by Defendant's brother, Paul Harris, with whom he had previously conducted numerous transactions. On May 18, 1990, Detective Lucas instigated a meeting with Defendant in an effort to obtain an eighth of an ounce of rock cocaine. Defendant acted as a middleman between Detective Lucas and Defendant's dealer, Marion Bryant, in a transaction for an eighth of an ounce of rock cocaine for $200. Instead of paying Chris and Paul Harris cash for their role in the transaction, the arrangement was to give them each a cut of the cocaine sold.

Detective Lucas again contacted Defendant and expressed an interest to execute a similar transaction. On May 25, Defendant orchestrated the transaction between his dealer and Detective Lucas, and obtained one-fourth of an ounce for the price of $400. Paul Harris was not present for this transaction. This time, however, Detective Lucas suspected the amount of cocaine was light and insisted that he and Defendant go back to Detective Lucas' apartment to weigh it. Indeed, weighing proved Detective Lucas correct. Nevertheless, Detective Lucas gave Defendant part of the cocaine for his compensation.

The third count arose from a similar transaction on May 28, 1990. Again, Detective Lucas purchased a quarter of an ounce, took it back to his apartment, weighed it, and gave Defendant a cut. Upon weighing, Detective Lucas discovered the transaction was again light and refused to participate in future drug transactions with Defendant.

After a trial to the court, the judge found that there was no genuine question Defendant facilitated the cocaine deal but was concerned about the methodology of the transaction. The district court rejected the defense of entrapment on all three counts, as it found that Defendant "was ready, willing and able to freely obtain the requested controlled substance for the undercover agent." The district court, however, was offended by the payment in kind to Defendant for his compensation. Because Detective Lucas participated in such an arrangement, the district court found the government "engaged in the distribution of a controlled substance in direct violation of federal law." Consequently, the court *sua sponte* dismissed Counts II and III reasoning that the government engaged in outrageous conduct. Count I was not dismissed because the court determined that Detective Lucas had a safety justification in giving the Defendant a cut of the rock cocaine as he was within the confines of Harris' apartment and in the presence of both the Defendant and his brother. The court felt there was no such justification in Counts II and III which both occurred at Detective Lucas' apartment.

At trial, Defendant readily admitted he could be categorized as a user. Prior to the transactions with Detective Lucas, Defendant would generally buy $20 worth of cocaine for himself whenever he could afford it. Al-

though the district court never explicitly made such a factual finding, it would be a rational inference to conclude Defendant was addicted to cocaine. The record further indicates Defendant had accumulated no money or possessions of any value, possessed no scales or any other paraphernalia associated with cocaine distribution, and was unaware of the amount of cocaine he would receive for $20. Moreover, Defendant contends he engaged in the transactions because he was promised he would receive a large enough cut of the cocaine to make it worth his while. Therefore, Defendant would most accurately be categorized as an addict whose sole motivation for arranging the transactions for Detective Lucas was to obtain some cocaine for himself.

Defendant did not appeal the district court's rejection of the entrapment defense, so we consider only the government's appeal of the dismissal of Counts II and III for outrageous government conduct. We review the dismissal of the two counts of outrageous government conduct de novo. *United States v. Giles,* 967 F.2d 382, 386 (10th Cir.1992).

We sympathize with the district court's uneasiness regarding the facts of this case, but we perceive the troubling aspects of the government's conduct in a different light than the district court. Where the district court was offended by the government's active role in the distribution of narcotics, our concern focuses on the government's repeated transactions with an addict, in which the addict was given cocaine as compensation. It was apparent to the detective that Defendant was merely a user, yet the government instigated transactions a second and third time arguably stacking charges against the Defendant. Certainly, due process con-

cerns would prevent the government from arranging such transactions indefinitely, as the addict would continue to take as much cocaine as the government makes available. We must now consider on appeal whether these facts constitute outrageous government conduct.

## II. OUTRAGEOUS GOVERNMENT CONDUCT

▮ The notion of outrageous government conduct was first recognized in *United States v. Russell,* 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1642–43, 36 L.Ed.2d 366 (1973): "[W]e may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *Id.* In order to rise to that level the government's conduct must violate "that 'fundamental fairness, shocking to the universal sense of justice,' mandated by the Due Process Clause of the Fifth Amendment." *Id.* at 432, 93 S.Ct. at 1643 (citations omitted).[1] The outrageous conduct defense looks to the government's behavior rather than the state of mind of the defendant. *United States v. Mosley,* 965 F.2d 906, 909 (10th Cir.1992). "When the government's conduct ... is sufficiently outrageous, the courts will not allow the government to prosecute offenses developed through that conduct." *Id.* at 908.

"[M]ost of the circuits ... have recognized the viability of the outrageous government conduct defense," and no circuit has yet denied the existence of the defense. *Mosley,* 965 F.2d at 909.[2] The Tenth Circuit held the defense of outrageous governmental conduct

---

1. The due process concerns raised in *Russell* survived subsequent reexamination in *Hampton v. United States,* 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976). A three justice plurality rejected the notion that the conduct of the government could trigger due process concerns shielding the defendant from prosecution: "If the police engage in illegal activity in concert with a defendant beyond the scope of their duties the remedy lies, not in freeing the equally culpable defendant, but in prosecuting the police under the applicable provisions of state or federal law." *Id.* at 490, 96 S.Ct. at 1650. Both the concurring and dissenting opinions disagreed,

however, and the dissent expressed the belief that "*Russell* does not foreclose imposition of a bar to conviction—based upon our supervisory power or due process principles—where the conduct of law enforcement authorities is sufficiently offensive, even though the individuals entitled to invoke such a defense might be 'predisposed.'" *Id.* at 497, 96 S.Ct. at 1653 (Brennan, J. dissenting) (citation omitted).

2. *Mosley* cites cases in which each circuit except the Fourth and Sixth has recognized and addressed the defense.

"is manifestly reserved for only 'the most intolerable government conduct.'" *United States v. Warren*, 747 F.2d 1339, 1341 (10th Cir.1984) (citation omitted). Courts have imprecisely defined when the government's conduct becomes so intolerable that it is outrageous. Nothing more concrete than phrases such as "'shocking to the universal sense of justice,'" *United States v. Clonts*, 966 F.2d 1366, 1369 (10th Cir.1992) (citation omitted), and "fundamental fairness," *United States v. Twigg*, 588 F.2d 373, 379 (3d Cir.1978), have been employed to ascertain when the government's conduct is outrageous.

■ The amorphous defense of outrageous government conduct is so rarely accepted that we have found only two circuit court decisions setting aside convictions on that basis.[3] Moreover, district courts have only utilized the defense a handful of times to dismiss charges.[4] The Tenth Circuit in *Mosley* has enumerated two primary factors which were considered in the cases where outrageous government conduct was found. These factors include excessive government involvement in the creation of the crime, and significant governmental coercion to induce the crime. *Mosley*, 965 F.2d at 911–12.

### A. Creation of the Crime

■ Generally, the government may not manufacture a crime from whole cloth and then prosecute a defendant for becoming ensnared in the government's scheme. "The government may not 'engineer and direct the criminal enterprise from start to finish.'" *Mosley*, 965 F.2d at 911 (quoting *United States v. Ramirez*, 710 F.2d 535, 539 (9th

Cir.1983)). A classic example of this scenario is the *Twigg* case, where the government assisted and encouraged the defendant to set up a methamphetamine lab. The government provided the essential supplies and technical expertise, and when the defendants encountered difficulties in consummating the crime, the government readily assisted in finding solutions. *Twigg*, 588 F.2d at 381. The crime was engineered and directed entirely by the government and the defendants contributed nothing more than their presence and enthusiasm.

Unlike the scenario in *Twigg*, the government did not engineer the distribution crime for which Defendant was charged. Although the government may have initiated the transaction, it was Defendant who arranged and directed it. Defendant called his source, Marion Bryant, who was unknown at the time to Detective Lucas, and acted as an intermediary in transporting the cocaine and money between the two. Defendant oversaw the execution of each transaction. Thus, the government's role in instigating the transaction and acting as a buyer does not amount to creating the crime. Certainly it is permissible for the government to merely suggest an illegal activity. *Mosley*, 965 F.2d at 911–12.

### B. Coercion

We must determine whether the government's means of influencing the Defendant into participating in the transaction were coercive to the point of being outrageous. Primarily, we will focus on whether Detective Lucas' distribution of part of the rock cocaine

---

**3.** See *Twigg*, 588 F.2d at 380–81 (outrageous conduct when government agent supplied indispensable ingredient, purchased almost all other supplies, established the lab, and was the only one who had the knowledge necessary to manufacture methamphetamine); *Greene v. United States*, 454 F.2d 783, 786–87 (9th Cir.1971) (government activity helped reestablish and sustain bootlegging operations in which the government was a partial supplier and the only customer).

**4.** *United States v. Santana*, 808 F.Supp. 77 (D.Mass.1992) (court performs seven part analysis to determine applicability of outrageous government conduct to the government's distribution of narcotics. Court dismissed indictment charging defendants with possession of a sizable

drug sample provided by the government); *United States v. Marshank*, 777 F.Supp. 1507, 1523–24 (N.D.Cal.1991) (government collaborated with defendant's attorney during prosecution and investigation of defendant); *United States v. Gardner*, 658 F.Supp. 1573 (W.D.Pa.1987) (government agent persuaded defendant to obtain drugs for him using a perceived friendship and false promises, where defendant had no predisposition toward drug involvement); *United States v. Batres–Santolino*, 521 F.Supp. 744, 751–52 (N.D.Cal.1981) (government manufactured criminal enterprise in which the government supplied cocaine to defendants who were uninvolved in a drug-related enterprise until the government agent came on the scene).

to Defendant as compensation for his role in the transaction was excessively coercive. Defendant testified he was prompted to arrange the transaction by the promise to receive a cut of the cocaine.

■ In holding the method of compensation was indeed outrageous conduct, the district court emphasized that Congress has provided no exception for undercover agents to 21 U.S.C. § 841(a) which makes it "unlawful for any person knowingly or intentionally—(1) to ... distribute, or dispense ... a controlled substance." Such a literal interpretation of the statute does not consider the practical effect of such a holding. Determining that government distribution of narcotics constitutes outrageous conduct in and of itself would hinder a police department's ability to engage in successful undercover operations. We have previously held "the government can act as both supplier and buyer in sales of illegal goods." *Mosley*, 965 F.2d at 912; *see also Hampton*, 425 U.S. at 489–90, 96 S.Ct. at 1649–50. Additionally, the government has the authority to set up a reverse sting operation, in which agents distribute narcotics. *United States v. Perez*, 959 F.2d 164, 170 (10th Cir.), *vacated in part on other grounds*, 989 F.2d 1574 (10th Cir.1993). Thus, the district court's rationale that an undercover agent may not distribute narcotics in the course of a drug transaction unless the agent has a safety justification is wholly without legal support.

■ The issue becomes cloudier, however, when the government distributes narcotics to a known addict. Although no court has yet found such distribution outrageous conduct, it has been intimated that such conduct might indeed be outrageous. In ruling on a discovery motion, the court in *United States v. Diggs*, 801 F.Supp. 441, 448 (D.Kan.1992), held that "[e]vidence indicating that the government may have overborne defendant's will by taking advantage of his drug addiction is relevant to the defense of outrageous government conduct." Upon appeal, Defendant contends that "Lucas ... preyed on appellee's addiction by promising to reward him with cocaine for his assistance." Therefore, the method of compensation employed by Detective Lucas is relevant to an outrageous conduct determination.

Keeping in mind that the facts of each individual case are pivotal in making an outrageous conduct determination, we will examine the disposition of other cases in which the government supplied narcotics to a known addict. In *United States v. Ford*, 918 F.2d 1343 (8th Cir.1990), the defendant testified at trial that he had been involved with drugs for thirty years and was a heroin addict. During the course of undercover operations the government provided small amounts of cocaine and heroin to the defendant, which it believed was "necessary to create trust and facilitate the undercover relationship." *Id.* at 1347. The court held this was a "prudent and necessary response to the exigencies of the drug trafficking world." *Id.* at 1349. The Eighth Circuit laid down a definitive guideline: "We hold, therefore, that an undercover officer's providing a known addict with small quantities of drugs to facilitate and enhance the undercover relationship does not constitute outrageous conduct." *Id.* at 1350.

In *United States v. Valona*, 834 F.2d 1334 (7th Cir.1987), an undercover agent provided the defendant with a 3.5 gram sample of cocaine. The court pointed out that it is permissible for the government to supply a small amount of drugs in the course of an investigation. *Id.* at 1344. They noted, however, that the court should "closely examine government conduct when the government supplies the contraband." *Id.* at 1344–45.

Finally, in *United States v. Barrera–Moreno*, 951 F.2d 1089 (9th Cir.1991), *cert. denied*, — U.S. ——, 113 S.Ct. 417, 121 L.Ed.2d 340 (1992), — U.S. ——, 113 S.Ct. 985, 122 L.Ed.2d 137 (1993), the government relied on a confidential informant who frequently used cocaine with one defendant, Barrera, to the point where Barrera became addicted. The informant and another defendant, Ruiz, arranged a situation where Ruiz would obtain a kilo of cocaine for the informant to sell, and Ruiz would keep two ounces as payment. The trial court "found that the informant supplied Ruiz with cocaine for personal use 'to the point where [the informant] was at least partially responsible for Ruiz

becoming addicted.'" *Id.* at 1091. The Ninth Circuit pointed out that the government did not necessarily condone the conduct of the informant, and was only "guilty of 'passive tolerance.'" *Id.* at 1092. In the alternative, the court found that even if the government did direct the informant's activities, there was no due process violation, as the informant's conduct was less egregious than in other cases where the defense had been rejected. *Id.* at 1092.

Any definitive rule of law concerning whether a government agent's sale of narcotics to a known addict constitutes outrageous government conduct would necessarily be flawed. On many occasions, a government agent might not be able to infiltrate a drug ring and be taken into confidence of the illegal entrepreneurs unless he has the authority to distribute contraband. *Cf. Russell,* 411 U.S. at 432, 93 S.Ct. at 1643. Necessarily, many of the transactions with dealers are also transactions with addicts and disallowing such transactions would severely inhibit the undercover operation. As the Eighth Circuit explained in *Ford,* 918 F.2d at 1349:

> If we prevent undercover officers from ever giving quantities of drugs to drug sellers who were also drug addicts, any dealer would easily be able to avoid arrest by informing potential purchasers of their addiction, real or phony, and asking for a sample of the drug. If the purchaser refuses, the dealer would likely conclude that the purchaser is a police officer, and refuse to sell the drugs. Thus, the efficacy of undercover operations would be greatly reduced and undercover agents would be seriously compromised.

Therefore, it would be nonsensical to promulgate a rule holding outrageous government conduct each and every time the government distributed narcotics to a known addict.

Conversely, any rule that permits unlimited sales of narcotics to known addicts would also lack merit. At a certain threshold, the government's conduct would violate due process. For instance, we speculate that if a government agent entered a drug rehabilitation treatment center and sold heroin to a recovering addict, and the addict was subsequently prosecuted for possession of a controlled substance, the outrageous government conduct defense might properly be invoked.

█ Applying the outrageous conduct framework from the aforementioned cases, we must determine whether the facts in this case are egregious enough to violate due process. We hold that they are not. Undoubtedly, it should not be an encouraged police practice to entice addicts into drug transactions using the lure of controlled substances. In this case, there is a factual dispute as to who initially suggested the method of compensation. Defendant admits, however, that he had no interest in obtaining cash as compensation. Thus, from Detective Lucas' point of view, the deal depended upon giving the Defendant a cut for his participation. As in both *Ford* and *Valona,* the Defendant here was given a relatively small amount of cocaine. Because payment in kind was a typical way of transacting business on the streets, Detective Lucas let the deal progress as arranged. By way of comparison, Detective Lucas' conduct was no more egregious than the government conduct held not to be outrageous in the *Ford, Valona,* and *Barrera–Moreno* cases. Although Detective Lucas may have enticed the Defendant to participate in the transaction, he was not coerced to the point of outrageousness.

## C. Stacking of Charges

█ We have concluded the government did not create the crimes for which Defendant is charged, nor was the method of compensation so coercive that Defendant's due process rights were impinged. We must still address the troubling fact that the undercover agent initiated a second and third transaction with an addict who was merely acting as a middleman. Because the Sentencing Guidelines remove a significant amount of discretion from the trial court, the sentencing judge cannot adjust the sentence to account for similar charges which exaggerate the defendant's culpability due to the repetitive nature of the criminal activity. Absent a specific investigatory purpose, the agent could not continue to conduct these transactions *ad infinitum* thereby constantly in-

creasing the charges, which necessarily increases the attendant mandatory sentence length. Such conduct is not necessarily outrageous, however, since multiple transactions may, under appropriate circumstances, serve a legitimate investigatory function. An undercover agent cannot always predict what information he will learn in the course of his investigation. Accordingly, police "must be given leeway to probe the depth and extent of a criminal enterprise to determine whether coconspirators exist, and to trace the drug deeper into the distribution hierarchy." *United States v. Calva*, 979 F.2d 119, 123 (8th Cir.1992). Consequently, it would be imprudent for us to adopt a per se rule prohibiting multiple transactions when an addict is involved. Where the evidence shows, however, that law enforcement personnel rely on a known addiction to carry out multiple transactions with the primary purpose of stacking charges, the government has engaged in outrageous conduct violative of the defendant's due process rights.

In cases involving such egregious conduct, "due process principles would absolutely bar the government from invoking judicial process to obtain a conviction." *Russell*, 411 U.S. at 431–32, 93 S.Ct. at 1643. The best mechanism available to prevent the use of improper government conduct in obtaining a conviction is the proper exercise of prosecutorial discretion. When a prosecutor fails to appropriately exercise his discretion, a court may properly intervene and dismiss or reverse the proceedings.

In the instant case the record is unclear regarding the extent of the government's knowledge of the defendant's addiction, the reliance on that addiction to conduct multiple transactions, and if any other purpose was served by the multiple transactions in this case. Accordingly, we **REMAND** for further proceedings consistent with this opinion.