THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. THOMAS MING, Defendant-Appellant.

Fifth District    No. 5—99—0618

Opinion filed October 23, 2000.

RARICK, J., specially concurring.

John Womick, of Womick & Associates, Chtrd., of Carbondale, for appellant.

D. Brian Trambley, State's Attorney, of Vienna (Norbert J. Goetten, Stephen E. Norris, and Patrick D. Daly, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

PRESIDING JUSTICE GOLDENHERSH delivered the opinion of the court:

After a bench trial in the circuit court of Johnson County, Thomas Ming (defendant), was convicted of four counts of unlawful delivery of a controlled substance (720 ILCS 570/401(c)(2) (West 1996)) and was sentenced to concurrent four-year terms in the Department of Corrections on each count. The issue raised on appeal is whether an undercover police officer's actions, which included allowing defendant to have for his personal use a small amount of the cocaine purchased by the undercover officer, were so outrageous as to constitute a violation of defendant's due process rights. We affirm.

## FACTS

The charges against defendant stemmed from his assistance in the purchase of cocaine for undercover agent Richard Malone. Malone was a Pulaski County deputy sheriff assigned as a narcotics investigator to the Southern Illinois Drug Task Force. Malone's confidential source was Tony Belden. Malone and Belden approached defendant, a person with a long history of drug abuse and a penchant for cocaine, to arrange a drug transaction with Ricky Goodman, a drug dealer who was moving cocaine and cannabis from Chicago. A series of five drug purchases was arranged by defendant in which Malone was present. On the first four occasions, defendant was present. On the fifth occasion, Malone purchased narcotics from Goodman, but defendant was not present. The transactions occurred between June 2, 1998, and July 9, 1998. On each of the deliveries in which defendant was present, defendant called Goodman and arranged for him to bring the cocaine to defendant's residence.

On September 17, 1998, defendant was charged by information with six drug offenses, including one count of calculated criminal drug conspiracy (720 ILCS 570/405(a) (West 1998)) and five counts of unlawful delivery of a controlled substance (720 ILCS 570/401 (West 1998)).

At the preliminary hearing, Malone testified that defendant was not compensated for setting up the transactions. However, on February 16, 1999, defendant filed a motion to dismiss on the basis that he was given cocaine for his personal consumption, that he used the cocaine in the presence of Malone on more than one occasion, and that "delivery of drugs by the Government to an addict to obtain his cooperation is illegal, outrageous, and violates basic concepts of fairness and due process." Attached to the motion was the affidavit of Malone's confidential source, Tony Belden. The affidavit stated that Belden was present on several occasions in June and July 1998 when Malone purchased cocaine from Goodman. Belden stated: "[A]fter the delivery was completed, Malone would take some of the cocaine out of the package and give it to [defendant] for making the call to Goodman and for using the house. I have observed the delivery from Malone to [defendant] on more than one occasion." On March 4, 1999, a hearing was held on defendant's motion to dismiss.

Defendant's first witness was Officer Malone, who testified that he was present at four drug transactions, which occurred on June 2, June 4, June 12, and June 17, 1998, at defendant's residence, and that Belden was present at the first three transactions. In each instance, Malone purchased powdered cocaine from Ricky Goodman. Defendant introduced Malone to Goodman as a favor to Belden. At the preliminary hearing, Malone denied giving any narcotics to defendant as payment. He stated that during the last transaction on July 9, 1998, he left $50 with Goodman to give to defendant "as compensation for arranging the deal." However, during the hearing on the motion to dismiss, Malone admitted that defendant did receive a small amount of cocaine, but Malone explained that it only occurred during the first transaction on June 2, 1998, and only because defendant insisted. Malone described what happened after his transaction with Goodman was completed: "[Defendant] asked me if I could take care of him, if I could hook him up." The prosecutor then inquired what the above response meant, and Malone explained as follows:

> "Meaning give him some of the cocaine out of the bag. I told him no and he persisted[;] he kept telling me that I was messed up because I had, correction, he had introduced me to Mr. Goodman and I needed to take care of him and what not, and at the time, not wanting to[,] I guess you'd say[,] blow the investigation, definitely there was going to be a larger transaction later, I complied with Mr. Ming. I wanted out of that house at that time. And I was under the impression that if I didn't give Mr. Ming something, we would not have another deal."

Malone testified that he did not see defendant consume any drugs and

that defendant did not receive any additional drugs during the later transactions.

Malone changed his report nearly three months after Belden's affidavit was filed and nearly seven months after the first transaction, to reflect that defendant removed and ingested approximately one line of cocaine from the bag. At the time the charges were filed, the State was unaware that defendant had ingested cocaine out of the bag purchased by Malone from Goodman. Malone acknowledged that all cocaine amounts delivered to the lab weighed less than the amounts allegedly purchased. Malone explained that dealers routinely try to shortchange the purchasers in order to increase profits and that once the drugs are taken out of the packages in which they are sold, the weight is reduced.

During all the transactions, Malone wore a body microphone. Defense counsel played portions of those tapes and suggested that there were sniffing and scratching noises that were the ingestion and cutting of cocaine provided to defendant by Malone. Malone denied defense counsel's allegations.

Tony Belden testified that he was with Malone on three occasions in June 1998 during which Malone purchased cocaine from Goodman. Defendant arranged the meetings between Goodman and Malone. Belden testified that it was his understanding that defendant, "the middle man," would ultimately be cut out of the transactions but that he would be paid for his involvement by getting to consume some of the drugs for his personal use. Belden never saw defendant actually consume any of the drugs because he left the room after the transactions were completed. On cross-examination, Belden explained that he instigated discussions about a "turn on" for defendant with Malone because he knew that defendant would not "keep getting [Malone] hooked up with drugs without getting something." Belden told Malone to give defendant some drugs or cash if defendant asked for either.

Defendant testified that, while growing up in California, he began using marijuana in the eighth grade and gradually started doing other drugs, including acid, mushrooms, and cocaine, which he particularly enjoyed but could not often afford. Defendant agreed that he was approached by Malone and Belden to arrange some drug deals with Goodman. According to defendant, he was to receive some cocaine "out of the bag" for introducing Malone to Goodman. Defendant claimed that, after each transaction, Malone gave him a portion of the cocaine for his personal consumption and that on one occasion Malone used a razor to cut the cocaine and form it into lines for defendant's consumption. Defendant testified that he asked Malone to "cut" the cocaine for him because he was too shaky to do it himself; however, the tapes fail

to reflect that such a conversation occurred. Defendant claimed that scraping sounds on the tape were caused by chopping up lumpy cocaine and that sniffing sounds were caused by defendant "snorting" the cocaine. At one point, defendant asserted that he had been involved with cocaine since he was a freshman in high school. He later stated that he had not been involved with drugs for a long time but that he became involved again when Malone and Belden came by to speak with him. Defendant admitted that he had been convicted of burglary in California.

The State recalled Officer Malone to rebut defendant's testimony. Malone testified that he interviewed defendant on September 17, 1998, after defendant was arrested. At that time, defendant told Malone that he remembered Malone coming over to his house and purchasing cocaine but that he could not remember the specific details. Defendant told Malone his memory was limited due to habitual drug use. Malone insisted that defendant only took some cocaine out of the bag after the first transaction on June 2, 1998, and not after any other transaction. Malone testified that between the second and third transactions, sometime between June 4 and June 12, 1998, he told one of his supervisors that he allowed defendant to take cocaine out of the bag. Malone admitted that he was under investigation by internal affairs based upon information provided to the department by defense counsel.

The trial court denied defendant's motion to dismiss, and a stipulated bench trial ensued. Counts I and II were dismissed, and defendant was found guilty on the remaining four counts of delivery of a controlled substance on the theory that he was accountable for the conduct of Goodman. At the sentencing hearing, the trial court remarked that Officer Malone's conduct was "not a glowing example of what law enforcement should demonstrate." The court stated: "I don't think there's any question he exceeded the bounds of zealousness here. Whatever his motives were to ferret out crime, but [sic] in the end he accomplished that goal." Thereafter, the trial court sentenced defendant to concurrent four-year prison terms. Defendant now appeals.

## ANALYSIS

The issue raised by defendant is whether Officer Malone's actions were so outrageous as to constitute a violation of defendant's due process rights. Defendant contends that the State should have been barred from using the judicial process to obtain a conviction against defendant, due to the outrageous actions of the undercover narcotics agent, and that, thus, the trial court erred in refusing to dismiss the case.

The State responds: (1) the concept of outrageous police conduct as a bar to prosecution should be rejected outright, and (2) alternatively, the actions of the undercover officer in the instant case were not so outrageous that defendant's motion to dismiss should have been granted. We address first whether or not outrageous police conduct is a viable defense.

## I. Validity of the Outrageous-Conduct Defense

■ The doctrine of "outrageous conduct," sometimes referred to as "outrageous misconduct," was introduced by the Supreme Court. In the course of discussing the entrapment defense, the Court speculated that it "may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *United States v. Russell*, 411 U.S. 423, 431-32, 36 L. Ed. 2d 366, 373, 93 S. Ct. 1637, 1643 (1973). The *Russell* Court went on to state that, in order to rise to the level of outrageous, the misconduct must be of such a nature that it violates " 'fundamental fairness, shocking to the universal sense of justice,' mandated by the Due Process Clause of the Fifth Amendment." *Russell*, 411 U.S. at 432, 36 L. Ed. 2d at 373, 93 S. Ct. at 1643, quoting *Kinsella v. United States ex rel. Singleton*, 361 U.S. 234, 246, 4 L. Ed. 2d 268, 276, 80 S. Ct. 297, 303 (1960). The outrageous-misconduct defense was further addressed by the Supreme Court in *Hampton v. United States*, 425 U.S. 484, 48 L. Ed. 2d 113, 96 S. Ct. 1646 (1976).

In *Hampton*, the defendant was convicted of distributing heroin, despite his argument that because the heroin had been supplied by a government informer and sold by the defendant to an undercover agent, the defendant's due process rights had been violated. The Supreme Court affirmed the conviction but wrote three separate opinions. The plurality opinion found that neither the defense of entrapment nor the defense of outrageous conduct was available to the defendant because the defendant was predisposed to commit the crime. The plurality opinion stated, "If the police engage in illegal activity in concert with a defendant beyond the scope of their duties[,] the remedy lies[ ] not in freeing the equally culpable defendant[ ] but in prosecuting the police under the applicable provisions of state or federal law." *Hampton*, 425 U.S. at 490, 48 L. Ed. 2d at 119, 96 S. Ct. at 1650 (plurality opinion of Rehnquist, J., joined by Burger and White, JJ.). Two justices concurred in the result but refused to foreclose the possibility of the fundamental-fairness defense even where predisposition is shown. *Hampton*, 425 U.S. at 491-95, 48 L. Ed. 2d at 119-22, 96

S. Ct. at 1650-53 (Powell, J., concurring, joined by Blackmun, J.). On the other hand, the dissenting justices believed that the behavior of the law enforcement officials was sufficiently offensive to bar a conviction. *Hampton*, 425 U.S. at 495-500, 48 L. Ed. 2d at 122-25, 96 S. Ct. at 1653-55 (Brennan, J., dissenting, joined by Stewart and Marshall, JJ.). Accordingly, *Hampton* stands for the proposition that even though proof of predisposition to commit a crime will bar the application of the entrapment defense, fundamental fairness will not permit any defendant to be convicted of a crime in which police conduct is outrageous. See *United States v. Twigg*, 588 F.2d 373, 378-79 (3d Cir. 1978).

■ The outrageous-conduct defense is distinct from the entrapment defense because while the entrapment defense looks to the state of mind of the defendant in order to determine whether he or she was predisposed to commit the crime being prosecuted (*Jacobson v. United States*, 503 U.S. 540, 548-49, 118 L. Ed. 2d 174, 184, 112 S. Ct. 1535, 1540 (1992)), the outrageous-conduct defense looks at the government's behavior. See *United States v. Gamble*, 737 F.2d 853, 858 (10th Cir. 1984). The defense of outrageous conduct is premised upon the notion that the due process clause imposes limits upon how far the government can go in detecting crime irrespective of the character of the target. See *People v. Hirsch*, 221 Ill. App. 3d 772, 779, 582 N.E.2d 1228, 1232 (1991). We are cognizant that "[t]he banner of outrageous misconduct is often raised but seldom saluted" (*United States v. Santana*, 6 F.3d 1, 4 (1st Cir. 1993)) and that one circuit of the United States Court of Appeals has declared the defense dead (*United States v. Boyd*, 55 F.3d 239 (7th Cir. 1995)). In addressing whether or not the doctrine is valid, the *Boyd* court stated:

"Today we let the other shoe drop, and [we] hold that the doctrine does not exist in this circuit. The gravity of the prosecutors' misconduct is relevant only insofar as it may shed light on the materiality of the infringement of the defendants' rights; it may support, but it can never compel, an inference that the prosecutors resorted to improper tactics because they were justifiably fearful that without such tactics the defendants might be acquitted." *Boyd*, 55 F.3d at 241.

First, we point out that decisions of United States District Courts and Courts of Appeal are not binding on Illinois courts. See *City of Chicago v. Groffman*, 68 Ill. 2d 112, 118, 368 N.E.2d 891, 894 (1977). Second, it is noteworthy that *Boyd* dealt with prosecutorial misconduct, while the instant case deals instead with the alleged misconduct of an undercover drug agent. Finally, we disagree with the *Boyd* court's holding that the doctrine is dead. Contrary to the holding in *Boyd*, the fact remains that most jurisdictions at least acknowledge that such a defense exists.

For example, *United States v. Mosley*, 965 F.2d 906, 909 (10th Cir. 1992), cited cases from 11 circuits, all of which agreed that the defense of outrageous conduct exists. Several Illinois cases have discussed the defense of outrageous government conduct with respect to undercover drug officers and recognize its validity, including *People v. D'Angelo*, 223 Ill. App. 3d 754, 585 N.E.2d 1239 (1992), decided by the Fifth District. The *D'Angelo* court found that because defendant failed to raise the issue of outrageous conduct in his posttrial motion, the issue was waived, but the court legitimized the defense by stating, "In any event, we do not believe that the conduct of the government agents in this case is so outrageous that it violates fundamental fairness or shocks the conscience." *D'Angelo*, 223 Ill. App. 3d at 782, 585 N.E.2d at 1257. In both *People v. Johnson*, 123 Ill. App. 3d 363, 462 N.E.2d 948 (1984), and *People ex rel. Difanis v. Boston*, 92 Ill. App. 3d 962, 416 N.E.2d 333 (1981), the defense of outrageous governmental conduct was recognized as a separate defense from that of entrapment. However, none of those courts believed that the conduct complained of rose to the level of outrageousness necessary to bar the action or exclude evidence. In fact, no Illinois case has yet to find outrageous government conduct sufficient to bar the prosecution of the defendant; on the other hand, no Illinois case has denied the doctrine's validity. After considering the historical perspective of the doctrine, we hold that it is a valid defense in Illinois. We now must consider whether the doctrine is applicable to the facts of the instant case.

## II. Applicability of the Outrageous-Conduct Defense

Whether the circumstances of a case demonstrate outrageous government conduct is a question of law for the court to decide. See *People v. Johnson*, 123 Ill. App. 3d 363, 373-74, 462 N.E.2d 948, 955 (1984). A defendant can raise the defense of outrageous conduct if the government was overly involved in the creation of a crime or if the government coerced the defendant into participating. See *United States v. Mosley*, 965 F.2d 906, 912 (10th Cir. 1992). Whether or not conduct is outrageous must be determined on an *ad hoc* basis and cannot be reduced to a specific formula. See *United States v. Santana*, 6 F.3d 1, 6 (1st Cir. 1993).

In reaching its determination that outrageousness must be applied on a case-by-case basis, the *Santana* court reviewed the lower court's seven-part test, which was devised to be applied in situations in which it is alleged that the conduct of a drug enforcement agent was so outrageous that a defendant's due process rights were violated. The test directed courts to consider (1) the type of drug furnished, (2) the sample's potency or purity, (3) the size of the sample, (4) whether

the defendant requested the sample, (5) whether or not the drugs were recovered, (6) what likely happened to the drugs, and (7) whether the sample itself constitutes the *corpus delicti* of the crime charged. *Santana*, 6 F.3d at 6. While the *Santana* court appreciated the district court's efforts to structure such a test, it found that "there is simply no way to reduce the myriad combinations of potentially relevant circumstances to a neat list of weighted factors without losing too much in the translation." *Santana*, 6 F.3d at 6. We agree with the *Santana* court that there is no universal litmus test for a court to utilize to determine whether or not conduct is outrageous. The seven factors listed above, as well as other tests devised, such as the Drug Enforcement Administration's guidelines, described in a footnote in *Santana* (6 F.3d at 6 n.8), are a good place to start in drug cases, but each case must be judged on its own facts. Ultimately, the outrageousness of a police officer's actions must be evaluated by (1) taking into account the totality of the relevant circumstances (*Santana*, 6 F.3d at 7) and (2) considering whether or not the totality of the circumstances show misconduct of such a nature that it violates fundamental fairness and is shocking to our universal sense of justice. See *Russell*, 411 U.S. at 432, 36 L. Ed. 2d at 374, 93 S. Ct. at 1643.

The practicalities of drug enforcement require that, on some occasions, law officers will need to supply some item of value. See *Russell*, 411 U.S. at 432, 36 L. Ed. 2d at 374, 93 S. Ct. at 1643. The general rule is that the government may supply drugs to a suspect in the course of a drug investigation. See *Hampton*, 425 U.S. at 491, 48 L. Ed. 2d at 119, 96 S. Ct. at 1650 (Powell, J., concurring). Several courts have held that providing a known addict a small quantity of drugs in order to facilitate the progress of an undercover agent's work does not constitute outrageous misconduct. See *United States v. Harris*, 997 F.2d 812, 817-19 (10th Cir. 1993); *United States v. Barrera-Moreno*, 951 F.2d 1089, 1092 (9th Cir. 1991); *United States v. Ford*, 918 F.2d 1343, 1349-50 (8th Cir. 1990). In *Ford*, the defendant testified at the trial that he had been involved with drugs for 30 years and was a heroin addict. During the course of undercover police operations, the government supplied small amounts of both cocaine and heroin to the defendant in order to "create trust and facilitate the undercover relationship." *Ford*, 918 F.2d at 1347. The *Ford* court held "that an undercover officer's providing a known addict with small quantities of drugs to facilitate and enhance the undercover relationship does not constitute outrageous conduct." *Ford*, 918 F.2d at 1350. We agree with the *Ford* court's analysis that providing a small amount of drugs to a known addict in order to maintain effective enforcement activities *per se* is not shocking to our sense of justice.

One of the few cases to actually advance the defense of outrageous police misconduct from pure theory to reality is *United States v. Twigg*, 588 F.2d 373 (3d Cir. 1978), which is distinguishable from the case before us. In *Twigg*, a government informant suggested the establishment of a laboratory to manufacture "speed." The government supplied a chemical used to make the drug, made arrangements with chemical supply houses to provide the other ingredients, and provided the production site, and a government agent was completely in charge of the operation. Thus, *Twigg* involved an egregious case of government overinvolvement in which the government's undercover operative essentially concocted and conducted the entire illicit scheme. The *Twigg* court characterized the police conduct as "so overreaching as to bar prosecution of the defendants as a matter of due process of law." *Twigg*, 588 F.2d at 377. In a footnote, the *Twigg* court stated:

> "We are adhering to Justice Powell's reasoning [in *Hampton*] that in evaluating whether government conduct is outrageous, the court must consider the nature of the crime and the tools available to law enforcement agencies to combat it." *Twigg*, 588 F.2d at 378 n.6.

Unlike *Twigg*, which dealt with manufacturing operations, the instant case deals with the sale of drugs.

■ Malone testified that, after the first transaction, defendant insisted that Malone give him some drugs out of the bag, for introducing Malone to Goodman. Finally, Malone relented and allowed defendant to take some cocaine out of the bag, but Malone did not see defendant actually consume the cocaine. Malone insisted that defendant received cocaine only after the first transaction. Later, Malone paid defendant $50 for defendant's participation in the transactions. On the other hand, defendant testified that Malone gave him a few lines of cocaine out of the bag after each transaction. A complete review of defendant's testimony shows that he was less than credible, but whether it happened on only one occasion or on four occasions would not change our determination. Even defendant agreed that he was only given cocaine *after* the crime was already committed and that it was never more than a few lines. The tape recordings made during the course of the transactions did not show that Malone was the initiator, and overall, the record does not show that defendant was reluctant to commit the crime. Malone was not overly involved, nor did he coerce defendant into participating.

We will assume for purposes of this appeal that defendant was, in fact, an addict. As previously stated, providing a small amount of drugs to an addict in order to aid the progress of undercover operations does not shock our conscience. While we do not condone it, we

cannot say that, because it happened, defendant is entitled to have the charges against him dismissed. Nevertheless, we do not excuse Agent Malone's lack of forthrightness about giving defendant cocaine. The remedy, however, lies not in freeing defendant but in prosecuting Malone for perjury, if such a charge can be proven, or in disciplining Malone through internal affairs. See *Hampton*, 425 U.S. at 490, 48 L. Ed. 2d at 119, 96 S. Ct. at 1650. At the time of the hearing on defendant's motion to dismiss, Malone was already under investigation by internal affairs based upon information provided by defense counsel. Nevertheless, in citing the plurality opinion in *Hampton*, we do not mean to imply that, if presented with the same factual scenario as *Hampton*, we would necessarily affirm. The facts in *Hampton* were more offensive than the facts of the instant case, because in *Hampton* the government actually supplied the heroin ultimately sold by the defendant to an undercover agent. Under the facts of the instant case, however, it would not have been appropriate to dismiss the charges against defendant because of the actions of Malone.

## CONCLUSION

We hold that the defense of outrageous police conduct is a valid defense. However, its application is not warranted under the facts of the instant case. Should the proper factual situation arise, courts should apply the doctrine of outrageous police misconduct and dismiss the charges against a defendant. In our civilized society, the government cannot be allowed to become criminal in combating crime.

For the foregoing reasons, the judgment of the circuit court of Johnson County is hereby affirmed.

Affirmed.

KUEHN, J., concurs.

JUSTICE RARICK, specially concurring:

Although I am compelled to concur with the majority decision, I write separately to express my profound distaste for the unprofessional and totally inappropriate conduct of the undercover agent in this instance, conduct that I would condemn.